**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Daniel Neal HELLER,**
**Defendant-Appellant.**

**No. 86–5966.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 29, 1987.

**151**

M. Carr Ferguson, Jr., Davis, Polk & Wardwell, New York City, John W. Nields, Jr., Howrey & Simon, Washington, D.C., Lisa Heller Green, Heller & Kaplan, Miami, Fla., for defendant-appellant.

Dwight Sullivan, Miami, Fla., for ACLU.

Leon B. Kellner, U.S. Atty., John O'Sullivan, Mayra Reyler Lichter, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before RONEY, Chief Judge, ANDERSON and EDMONDSON, Circuit Judges.

ANDERSON, Circuit Judge:

Daniel Neal Heller appeals his conviction on three counts of tax evasion in violation of 26 U.S.C. § 7201. He bases his appeal on four aspects of his prosecution and trial. Because of the conclusions we reach below as to the jury charge and the misconduct issue, we reverse Heller's conviction and remand for a new trial.

## I. FACTS

Daniel Neal Heller is an attorney who has practiced law in Miami, Florida since 1950. For most of the time he practiced law he kept two separate bank accounts which were related to his practice, a "personal" account which consisted of the income he claimed was earned at the time it was deposited into the personal account, and from which he made payments for things both of a personal nature, such as artwork for his home, and for business and office expenses. Heller's other account was an attorney trust account. This account contained, among other kinds of client funds, some nonrefundable retainers which had been paid to him by clients and some legal fees for cases in which Heller had not completed work. Heller sometimes borrowed funds from his attorney trust account for his personal use and in some instances repaid such loans. Heller did not report as taxable income any of the funds in his attorney trust account, including the amounts in the account which he borrowed. Instead, Heller claims that once the income was earned, i.e., once he completed work on a case whose fee had been deposited into the trust account, he shifted the money from his attorney trust account to his personal account and then reported the money as income. In support of this method, Heller relied at trial upon *Cohen v. Commissioner*, 24 T.C.Mem.Dec. (CCH) 728 (1965), a case in which the Tax Court approved a method of tax reporting by an attorney which was factually similar to Heller's. Based on this theory, Heller requested that the court charge the jury that it was not *criminal* for a lawyer to report a fee when the work to be done for the fee was completed. The trial judge refused to give the requested charge, and instead gave the jury the following instructions which were related to the *Cohen* issue:

> Mr. Heller contends that the tax laws were uncertain in 1975, 1976 and 1977. If you find credible evidence that the law was uncertain, you may consider that evidence on the question of whether Mr. Heller acted with improper intent. You may consider this evidence as bearing on Mr. Heller's intent even if he had no specific knowledge of the United States Tax Court case which Mr. Caplin [sic] brought to your attention.

> . . . . .

> Mr. Heller's position is that he believed that he could permissibly report his fees in the year when the work was completed. And as I have already instructed you, unless the government proves beyond a reasonable doubt that Mr. Heller acted in the belief that his returns were improperly filed, you must acquit.

In addition to the legal uncertainty defense, Heller asserted a reliance defense,

claiming that his accountant[1] was fully aware of his method of reporting his income and had approved it. At trial, the accountant testified that he had been unaware of Heller's method of dealing with earned and unearned fees until March 8, 1979. Heller claims that the accountant's testimony at his trial on this issue was false and was the result of threats of prosecution made against him by the two IRS special agents, Plave and Lopez, who were in charge of the criminal investigation of Heller. Both of these IRS agents had been involved in an IRS program called "Operation Leprechaun" which had attracted the attention of one of Heller's clients, *The Miami News.* During the course of the exposé of "Operation Leprechaun" by the newspaper, some legal proceedings occurred which involved Heller directly with IRS agents, and particularly with Agent Lopez, with whom Heller had a heated exchange of words in his office. When Heller learned that Agents Plave and Lopez had been assigned to his criminal investigation, he requested that they recuse themselves in favor of impartial investigators. They refused. Prior to meeting with Heller, Agents Plave and Lopez met with Heller's accountant, at which time they suggested that the accountant could be a "defendant in a criminal case." Heller claims that this alleged threat was made to induce his accountant to perjure himself when called as a defense witness, thus precluding Heller's reliance defense. Heller claims that this intimidation of his defense witness constitutes governmental misconduct which requires reversal. Heller also claims that the trial judge should have set aside the verdict and granted a new trial because of certain character evidence which the prosecutor introduced at Heller's trial and highlighted in her rebuttal summation to the jury.

1. Because we conclude on the basis of the record in this case that this accountant gave false testimony, *see* discussion at II.A. *infra,* we will not refer to him by name, but rather as the "accountant." Although the accountant was examined at length both by the government attorney and cross-examined by Heller's attorney, in the context of this case, he, of course, was not

## II. DISCUSSION

### A. *Governmental Misconduct*

Heller claims that he was deprived of his Fifth and Sixth Amendment rights to present testimony in his defense because IRS agents Lopez and Plave intimidated the accountant who prepared Heller's tax returns for the years at issue. In support of this contention, Heller draws our attention to the fact that immediately following Plave's admitted attempt to intimidate the accountant, the accountant caused his attorney to communicate to Plave that the accountant would provide testimony against Heller and that he wanted to be a witness and not a defendant.

Heller cites a number of cases in which criminal convictions have been reversed as a result of prosecutorial or judicial interference with the testimony of a defense witness. *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (where trial judge singled out a sole defense witness and admonished the witness at length as to the dangers of perjury and the witness thereafter refused to testify on behalf of the defense, defendant was deprived due process of law); *United States v. Hammond,* 598 F.2d 1008 (5th Cir.1979)[2] (holding that government statement to a witness that they would have "nothing but trouble" if they testified on behalf of defense requires reversal); *United States v. Morrison,* 535 F.2d 223 (3d Cir.1976) (prosecutor who pointedly warned defense witness of the dangers of testifying falsely in favor of the defendant, inducing witness to refuse to answer certain questions on the ground that the answers might incriminate her, deprived defendant of evidence he expected to place before the jury and therefore denied him his Sixth Amendment rights); *United States v. Thomas,* 488 F.2d 334 (6th Cir.1973) (government's threat to prosecute a witness if he chose to testify

examined by his own attorney and had no opportunity to adduce his own evidence.

2. This case was decided prior to the close of business on September 30, 1981, and is binding precedent under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

could not later be corrected by mere statement by the government that they would not prosecute the witness).

In testimony given both at the instant trial and at Heller's previous trial, IRS agent Plave acknowledged that on Friday, July 13, 1979, he threatened the accountant. Plave indicated to Heller's accountant that the accountant might be aiding and assisting Heller in tax fraud and indicated that the accountant could be a defendant as well as Heller. Plave also acknowledged that he intended to scare the accountant.[3] It is also undisputed that on the following Monday, July 15, 1979, the accountant's lawyer called Plave to say that the accountant would provide testimony against Heller and that he wanted to be a witness rather than a defendant. Finally, the record in this case is also clear that the accountant testified falsely against Heller. The accountant testified that Heller had told him that the monies deposited in his trust account were monies belonging to his clients, and that he had permission from the clients to borrow therefrom, and that the trust account might be in violation of Florida Bar Rules, but the trust account was a matter between Heller and his clients and was "not [the accountant's] concern." The accountant also testified that he had not known anything about Heller's alleged case-closed method of accounting, and that he had not explained that method to IRS Agent Kaplan during the regular course of her civil tax audit. In other words, the accountant's testimony was that Heller had concealed facts from him during the preparation of the returns, that he had not approved of Heller's case-closed method of accounting, and that he had not even heard of the method until March 8, 1979. The testimony and records of IRS Agent Kaplan demonstrate that the accountant's testimony was not true. At least by December 27, 1977, the date of the second meeting between Kaplan and the accountant during the civil tax audit, Kaplan's testimony and records indicate that the accountant told her that the monies in the trust account were advances from clients toward fees for work to be done in the future. Most significantly, on December 7, 1978, or January 16, 1979, long before the accountant testified he knew, the accountant told Kaplan about Heller's case-closed method of accounting.[4] Although there is other evi-

---

**3.** Plave testified at the first trial (which was reversed on other grounds by our court at 785 F.2d 1524 (1986)) that his main purpose was to "scare" the accountant. At the second trial, Plave acknowledged that his intention was to scare the accountant but asserted that his intention was not to preclude a valid defense of reliance on the advice of an accountant. At one point in his testimony, Plave stated his intention as being to "control" the accountant, and at another point he stated he intended to "scare" the accountant so he would waive his power of attorney and give the agents permission to talk to Heller directly. Whatever his precise intention, the record is clear that Plave did intentionally intimidate the accountant on Friday and on *the following Monday the accountant's lawyer* called Plave and said that the accountant wanted to be a witness and not a defendant. *Cf. Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972).

**4.** We draw this conclusion from Agent Kaplan's testimony and the notes made during the course of her civil audit. In particular, we rely upon the questions which Agent Kaplan prepared for her December 7, 1978 meeting with the accountant on which she also recorded her answers based on what the accountant told her. One of these questions is worded as follows: "Gross receipts—get explanation of how trust account is handled when fees are determined earned and picked up in income." The answer jotted beside it is "When case closed." At Heller's trial, Kaplan wavered when questioned by the prosecutor as to the exact date she jotted the answer "when case closed." However, on cross-examination, she admitted that at Heller's prior trial she had stated that that answer had been *received and recorded by her either at the December 7, 1978 meeting or at her next meeting* with the accountant on January 16, 1979, and at the most recent trial she did not deny the accuracy of her former response. Another indication that the response "when case closed" was written during Kaplan's December 7, 1978 meeting or January 16, 1979 meeting is the fact that the answers to the other questions which Kaplan had prepared about various details in Heller's tax returns appear to have been written in the same hand at the same time. These details were obviously things Kaplan wanted to know at these early meetings and responses which Kaplan would have received at such an early meeting, such as business travel expenses, automobile depreciation, etc. We further note that the question itself "when fees are determined earned and picked up in income" indicates that Kaplan already knew about the theory of reporting when "earned" which Heller was using. Since her only source of this information was

dence,[5] the foregoing undisputed evidence establishes that the accountant's testimony was false in very important respects, i.e., his knowledge of the case-closed method.

■ We conclude that Heller has been deprived of an important defense witness by substantial interference on the part of the government. Under these unique circumstances, Heller is entitled to a new trial.[6]

### B. The Requested Instruction

Heller claims that he was entitled to a jury instruction to the effect that if the jury found he was following the case-closed

method he had not committed a crime. We agree.

"It is settled that when the law is vague or highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it." *United States v. Critzer*, 498 F.2d 1160 (4th Cir.1974), *cited with approval in United States v. Garber*, 607 F.2d 92, 98–99 (5th Cir.1979) (en banc). Heller claims that the uncertainty in the law relevant to his case is evidenced by *Cohen v. Commissioner*, 24 T.C.Mem.Dec. (CCH) 728 (1965), a case in which the Tax Court approved a case-closed method of reporting advance payments to an attorney of costs and fees. Heller's argument is supported

the accountant, this is another indication that the accountant was well aware of Heller's theory of reporting income. In addition, other parts of Kaplan's notes and testimony indicate that she knew early on about Heller's theory of reporting income when a fee was "earned." On cross-examination, she testified that the accountant had given her the understanding that the "loans" in the trust account "represent withdrawals by taxpayer of unearned funds," and that $218,325 was added to Heller's income in 1976 as "the amounts of clients' funds in trust which became earned income in 1976." Record, vol. 30:127. At another point in her notes taken during the course of her meetings with the accountant, she noted that the trust account contained "client's advances on cases put in trust," Defendant's Exh. 5, and she testified that it was her understanding that these "advances" were toward future work to be done by Mr. Heller. Record, vol. 30:129, 133. We conclude that the only reasonable inference is that the accountant had told Kaplan about the case-closed method long before he said in his testimony that he first learned about it.

5. Other evidence in the record supports our conclusion that the accountant gave false testimony in the hopes of avoiding prosecution himself. However, the other evidence may be subject to conflicting inferences which would indicate the need for further evidentiary development and findings of fact. By contrast, the evidence described in the text of our opinion is undisputed and permits no other reasonable inferences. Therefore, we find it unnecessary to remand for a further evidentiary hearing. Among the other evidence upon which we need not rely is the following. The background of animosity which developed between Heller and IRS Agents Plave and Lopez during the course of the *Miami News'* uncovering of the Leprechaun story suggests that Plave and Lopez could have intended to intimidate and frighten the witness into false testimony in revenge against Heller. Also along these lines is the initial organizational meeting held at the IRS offices which

included both Plave and Lopez and occurred just prior to their approaching the accountant. At this meeting, Plave noted that a key objective in the investigation was to "preclude" Heller's reliance defense. Also casting doubt on the accountant's testimony as to when he first learned of the case-closed method is the memorandum of a meeting between the accountant and his senior partner in the accounting firm. The memorandum summary of the meeting written by the senior partner suggests that the accountant told the senior partner in detail about the case-closed method from his own knowledge. There is also no indication anywhere in this memorandum that the accountant communicated anything to the senior partner about Heller having changed his story about the trust fund which is what the accountant's testimony at Heller's trial was. To the same effect, the accountant's private and confidential work file on Heller contains no indication that Heller changed his story as to the trust fund at any point during the IRS investigation. Further casting doubt on the accountant's story is the fact that Heller summoned his former accountant to testify at trial. This accountant testified in great detail as to Heller's case-closed method and testified that Heller had been completely open and frank about this income reporting method when the former accountant had handled his case.

6. The conditions under which Heller may be retried, i.e., the steps necessary to alleviate the effects of the government's misconduct, is a difficult problem which will have to be addressed on remand. *See United States v. Morrison*, 535 F.2d 223 (3d Cir.1976). Moreover, we need not address two questions which other courts have discussed, i.e., the necessity of showing prejudice and the availability of harmless error. In this case, the prejudice to Heller is obvious. With respect to harmless error, the evidence against Heller was far from overwhelming and the error could not be harmless.

by precedent in the Supreme Court and this circuit. *James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), was construed by our *Garber* decision and the Fourth Circuit's decision in *Critzer* as holding that the requisite element of intent could not be proved when the law was uncertain or cast in doubt by prior court decisions. The Former Fifth Circuit adopted this reasoning in *United States v. McClain,* 593 F.2d 658 (5th Cir.), *cert. denied,* 444 U.S. 918, 100 S.Ct. 234, 62 L.Ed.2d 173 (1979), in which we held that willfulness could not be proved when the area of conduct was not proscribed in reasonably certain terms, and in *United States v. Garber,* in which we remanded a case where the trial judge had denied a defendant the opportunity to present a legal uncertainty defense.

■ Here, although Heller was allowed to present an uncertainty defense, he was denied the appropriate jury instruction. The *Cohen* case was sufficient, as a matter of law, to make it inappropriate to impose criminal liability for following the case-closed method of reporting the advance payment to an attorney of costs and fees. Therefore, if Heller followed such a method, or believed in good faith he was following the method, criminal liability cannot be imposed upon him. The jury should have been charged accordingly.

The government argues that the *Cohen* case is distinguishable because it involved advance costs rather than fees, because such advance costs were burdened with an obligation as to how they could be used, and because in any event Heller did not actually follow the case-closed method.

The *Cohen* case addressed the civil tax liability of an attorney whose principal client was Nationwide Insurance Company. Nationwide advanced to Cohen $100 for each common pleas court case and $50 for each county court case which he handled.

Cohen deposited these advances to his business bank account and commingled them with his other funds.

The first distinction urged by the government—i.e., that *Cohen* involved only advance costs rather than fees—is not factually correct. While it is true that the parties were motivated to initiate the arrangement for advancing payments because of the attorney's shortage of funds to meet litigation costs, and it is also true that Nationwide characterized the payments as advance costs; on the other hand, the taxpayer showed the advances as received on account of his fee, and the opinion of the Tax Court clearly treated the advances as in part advances of fees.

The government's second distinction also fails. While the syllabus to the opinion does suggest that the advances were burdened with an obligation as to use, the opinion itself makes it clear that the advances were actually commingled with taxpayer's own funds and the only strings or burdens mentioned by the Tax Court were that the advances would not become income until "each particular case was completed" and billed. Similarly, Heller claims that he deferred recognition until the work was completed.

The government's final distinction [7]—i.e., that Heller did not follow the case-closed method in any event—is not relevant to the issue of whether Heller was entitled to the requested instruction. There was evidence to support Heller's claim that he did follow the method, and therefore Heller was entitled to a proper instruction on his theory of defense.

■ Of course, there was also evidence to support the government's position that Heller did not actually follow the case-closed method and that his claim to have used the method was a ruse for tax evasion. For that reason, Heller was not enti-

---

7. Of course the government in this case has consistently maintained that the case-closed method is not permissible for a cash basis taxpayer. Because Heller has not actually contested this point, the issue is not before us for decision. The issue which is presented to us is whether Heller is correct in his position that the *Cohen* case introduced sufficient uncertainty to make *criminal* prosecution inappropriate. Al-

though we agree with Heller that the *Cohen* case made it inappropriate to impose *criminal* liability on Heller for following the case-closed method, we acknowledge that *Cohen's* treatment of advance payments of attorney's fees and costs is inconsistent with established general principles requiring a cash basis taxpayer to recognize income upon receipt. Thus, we caution taxpayers against reliance upon *Cohen* in the future.

tled to a judgment of acquittal notwithstanding the verdict. That issue—i.e., Heller's intent to follow the case-closed method—is a question of fact for the jury. *United States v. Garber,* 607 F.2d at 97; *United States v. Smalley,* 754 F.2d 944, 949 (11th Cir.1985). Since there was a general verdict, we cannot know whether the jury concluded that Heller never intended to follow the case-closed method; or whether the jury erroneously concluded that, although Heller followed the case-closed method, that method was so clearly illegal that Heller was guilty of criminal intent. We therefore remand so that a properly instructed jury can determine guilt or innocence.

### C. *Remaining Issues*

■ Heller further claims that the prosecutor's presentation of certain testimony concerning questionable deductions which he had taken in other years and other testimony in the same vein and the prosecution's comments in rebuttal summation deprived him of a fair trial. The admission of the evidence in question does not meet the abuse of discretion standard necessary for a reversal on this issue, nor do we find the prosecutor's comments in rebuttal summation to be so highly prejudicial as to require reversal on this issue.

REVERSED IN PART AND REMANDED.