UNITED STATES of America, Plaintiff,

v.

Dade SOKOLOFF, Thomas Griek, et al., Defendants.

No. 87–741–CR.

United States District Court,
S.D. Florida.

Sept. 15, 1988.

Myles Malman, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Jay R. Moscowitz, Coconut Grove, Fla., for defendant Marden.

Harold Keefe, Coral Gables, Fla., for defendant Cuthel.

A. Scott Miller, Miami, Fla., for defendant Hoover.

Joel Kaplan, Miami, Fla., for defendant Sokoloff.

Robert C. Stone, Hollywood, Fla., for defendant Fernandez.

Keith Haymes, Miami, Fla., for defendant Tomlinson.

Stephen Mechanic, Coconut Grove, Fla., for defendant Griek.

Michael Pasano, Coral Gables, Fla., for defendant Cates.

## ORDER

MARCUS, District Judge.

THIS CAUSE has come before the Court upon Defendants Dade Sokoloff and Thomas Griek's Motions for Bond Pending Appeal. After a jury verdict was returned on April 8, 1988, Sokoloff was convicted of Counts I and III of the indictment pursuant to 21 U.S.C. sections 963 and 846. Griek was also convicted of those counts and was additionally convicted of Count IV of the indictment pursuant to 21 U.S.C. section 841(a)(1). Both Defendants were sentenced

to prison terms by the Court. Currently Sokoloff and Griek are free on bond and seek to continue their bond pending the disposition of the appeal of their convictions to the Eleventh Circuit Court of Appeal.

Eligibility for release on bond pending appeal is governed by 18 U.S.C. section 3143(b). The government has conceded that these Defendants are not likely to flee and do not pose a danger to the community. 18 U.S.C. § 3143(b)(1). However, in order for a defendant to remain on bond pending appeal, we must be satisfied "that the appeal is not for purpose of delay and raises a substantial question of law or fact likely to result in reversal, an order for a new trial, or a sentence that does not include a term of imprisonment." 18 U.S.C. § 3143(b)(2). We find that the Defendants have failed to raise such an issue and therefore have failed to satisfy the conditions necessary to allow continuation of bond pending appeal.

The Eleventh Circuit has held that "a 'substantial question' is one of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided the other way." *United States v. Giancola,* 754 F.2d 898, 901 (11th Cir.1985) (*adopting United States v. Miller,* 753 F.2d 19 (3d Cir.1985)), *cert. denied,* 479 U.S. 1018, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986). Defendants raise two general issues and several sub-issues that will, they claim, likely result in reversal or an order for a new trial. The issues are addressed below.

*The "Fink" Issues:*

Defendants contend that this Court's rulings as to the unavailability of Randy Fink to testify on their behalf were violative of the Defendants' Fifth Amendment right to present witnesses on their behalf, and Sixth Amendment right to compulsory process. Our rulings on the "Fink" issues are embodied in Orders entered on April 7, 1988 and April 13, 1988. Briefly stated, Randy Fink was the purported leader of the "Fink organization." The Defendants in this cause were members of this organization, whose purpose was to smuggle marijuana into the United States.

On January 6 and January 10, 1986, Fink entered into a plea agreement wherein he agreed, among other things, to plead guilty to two counts of a four count indictment returned by a federal grand jury sitting in the Eastern District of Louisiana. In exchange for that plea, the government agreed to dismiss the other two counts, and further agreed that it would not pursue any other criminal violations, except for crimes of violence, in the Eastern District of Louisiana, and the Southern District of Florida involving narcotics violations and criminal tax violations. The plea agreement was predicated on Mr. Fink's cooperation in providing truthful testimony at debriefings and other proceedings. The United States Attorney for the Southern District of Florida has concluded that Fink has not been truthful in his "cooperation," and that the plea agreement, at least with this District, has been abrogated by Fink.

*United States v. Marden,* No. 87–741–CR–MARCUS, slip op. 1–2 (S.D.Fla. April 7, 1988) [Exhibit A]. [See Appendix pp. 1458–59.]

Defendants called Fink as a witness, and questioned him out of the presence of the jury. We ruled that Fink properly invoked his Fifth Amendment privilege against self-incrimination because the Government's representation that the plea agreement was abrogated placed Fink "in apprehension that his testimony could be used for, or in aid of a criminal prosecution against him." *Id.,* slip op. at 2 [see Appendix p. 1459] (*relying on United States v. Fortin,* 685 F.2d 1297 (11th Cir.1982)). We also specifically found at that time that the abrogation of the plea agreement was not the result of prosecutorial misconduct intended to obtain a tactical advantage by depriving the Defendants of an exculpatory witness. *Id.,* slip op. at 4–10 [see Appendix pp. 1459–62]. Finally, we found inadmissible under Federal Rule of Evidence 804(b)(3), statements purportedly made by Fink to counsel for two of the Defendants' counsel. *United States v. Marden,* No. 87–741–CR–

MARCUS (S.D.Fla. April 13, 1988) [Exhibit B] [see Appendix].

■ Defendants contend that this Court erred in allowing Fink to invoke his Fifth Amendment privilege, because either Fink did not have a reasonable fear of being prosecuted because his plea agreement was intact; or because the Government could not unilaterally abrogate the plea agreement but was required to submit the validity of the plea agreement to a judicial determination in the Eastern District of Louisiana. [Memorandum of Law in Support of Motion for Bond Pending Appeal, at 8]. Further, Defendants have suggested that in the absence of a determination of the validity of the plea agreement, this Court had the power to grant use immunity as to Fink's testimony in this trial. [Transcript of Excerpt of Proceedings, before the Honorable Stanley Marcus, July 11, 1988 at 3–13].

We find that there is no substantial question on appeal as to our ruling that Fink properly invoked his Fifth Amendment privilege against self-incrimination. At trial we found that there was a substantial basis to conclude that Fink had breached the plea agreement, and that prosecutions could possibly be instituted in this district against Fink for narcotics and tax violations. However, we further determined that because of the contradictory statements made by Fink during the course of the investigation, "any truthful testimony [by Fink] ... would probably conflict with at least some of those prior statements given to federal agents and subject him to potential criminal liability under 18 U.S.C. § 1001." *Marden*, slip op. at 3 (S.D.Fla. April 7, 1988) [see Appendix p. 1459]. Based on those conclusions, it is not a "close" question as to whether Fink properly invoked his Fifth Amendment privilege.

Accordingly, we are left to determine whether there is a substantial question of law as to whether we were in error in failing to fashion a remedy that would adequately protect the constitutional rights of both Fink and the Defendants. Defendants concede that the validity of the plea agreement may be determined only by the court before whom the agreement was entered. [Defendants' memo at 7 (*citing United States v. Gonzalez–Sanchez*, 825 F.2d 572, 578 (1st Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987); *United States v. Simmons*, 537 F.2d 1260, 1261 (4th Cir.1976) ]. Apparently, Defendants contend that we should have compelled the Government to seek a determination of the validity of the plea agreement before Judge Beer in the Eastern District of Louisiana, although such a request was never made during the trial. It must be emphasized at this point that this Court was confronted with the validity of the plea agreement only insofar as that issue related to Fink's right to invoke his Fifth Amendment privilege at trial in this case. In making our determination, we were satisfied that there existed a sufficient probability that the plea agreement had been breached and Fink was rightfully in apprehension that his testimony could be used in aid of a prosecution against him. We have been directed to no authority that stands for the proposition that in the midst of trial we were empowered—even if requested—to order the Government to seek a determination, in another district, of the validity of its plea agreement with a witness it had no intention of calling to testify. Moreover, we could hardly have ordered Fink to seek such a determination. Until an actual controversy developed between Fink and the Government as to the plea agreement, the district court in Louisiana had no occasion to address the expectations and obligations of these parties. To the extent that the issue became germane to the case at issue, this court held an extensive hearing and ruled. We know of no basis to compel a final resolution of this plea agreement between Fink and the Government in New Orleans, even if we had been asked to do so. Finally, considerations of comity and judicial economy militated against stepping down that road.

■ Based on our rulings, Defendants contend that by granting Fink use immunity pursuant to 18 U.S.C. sections 6002 and 6003 or "judicially created" use immunity pursuant to inherent powers under Article

III, we could have protected the rights of Fink and the Defendants. It is settled law that a court is without authority to grant use immunity to a witness under the federal statutes. As stated by the Supreme Court, "[n]o court has authority to immunize a witness. That responsibility ... is peculiarly an executive one, and only the Attorney General or a designated officer of the Department of Justice has authority to grant use immunity." *Pillsbury Co. v. Conboy*, 459 U.S. 248, 261, 103 S.Ct. 608, 616, 74 L.Ed.2d 430 (1983); *see also United States v. Doddington*, 822 F.2d 818, 821 (8th Cir.1987); *United States v. Pennell*, 737 F.2d 521, 526 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *United States v. Gottesman*, 724 F.2d 1517, 1524 n. 7 (11th Cir.1984).

We are also convinced that under binding precedent we were without authority to grant "judicial use immunity." The Supreme Court has never ruled on this issue, but only the Third Circuit has held that a court may immunize a defense witness so that exculpatory evidence may be presented. *Government of Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir.1980). However, every other circuit that has decided the issue has declined to follow *Smith*. *See United States v. Sampson*, 661 F.Supp. 514, 518 n. 2 (W.D.Pa.1987) (collecting cases). In particular, the Eleventh Circuit, in *Gottesman, supra*, expressly stated that it was bound by the precedent of the former Fifth Circuit that had rejected *Smith* and had "concluded that district courts may not grant immunity to a defense witness simply because that witness possesses essential exculpatory information unavailable from other sources." *Gottesman*, 724 F.2d at 1524 (*citing United States v. Thevis*, 665 F.2d 616, 639 (5th Cir.), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982)) (footnote omitted); *see also United States v. Valera*, 845 F.2d 923, 930–31 (11th Cir.1988); *United States v. Sawyer*, 799 F.2d 1494, 1506–07 (11th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987); *United States v. Herbst*, 641 F.2d 1161, 1168–69 (5th Cir. Unit B), *cert. denied*, 454 U.S. 851, 102 S.Ct. 292, 70 L.Ed.2d 141 (1981). Since this issue has been decided by controlling precedent, we find that it does not present a substantial issue on appeal.

We also believe that our decision to deny Defendants' application to introduce statements of Fink through the testimony of defense counsel does not raise a substantial issue on appeal. We found that the proffered hearsay statements were inadmissible under Federal Rule of Evidence 804(b)(3). While the declarant was unavailable, and the statements were arguably against penal interest, we found that the statements lacked sufficient indicia of reliability to allow their admission through these witnesses. *Marden*, slip op. at 5–7 (S.D.Fla. April 13, 1988) [see Appendix pp. 1460–61]. On appellate review our decision is subject to review under the clearly erroneous standard. *United States v. Bagley*, 537 F.2d 162, 166–67 (5th Cir.1976), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977). Defendants have not raised any argument that indicates the verdicts would be subject to reversal because the decision to exclude this evidence was clearly erroneous.

We are convinced that the "Fink issues" do not present a substantial issue that will likely result in reversal. Fink was entitled to invoke his Fifth Amendment privilege against self-incrimination. We were without authority to extract the purportedly exculpatory testimony by either enforcing the plea agreement, or by granting Fink immunity, or by admitting hearsay testimony. Finally, the unavailability of Fink was not the result of any prosecutorial misconduct.

*Juror Interviews*

■ On April 13, 1988, Defendant Marden filed a Motion Requesting Court Interview of Jurors. Two days later, Marden filed a supplement to that motion stating additional grounds in support of his motion. Defendants Sokoloff and Griek joined Marden's motion. [Orders, April 22, 1988]. This motion was denied in open Court. We write now to explain our reasons for this decision as well as our determination that

this, too, does not present a substantial issue likely to result in reversal.

The Defendants cite two communications with jurors that purportedly indicate that the verdict in this cause may be tainted by juror misconduct. They contend that the jurors should have been interviewed in order to establish whether the jury reached its determination because of an improper influence, or by prematurely considering the case.

Defendant Marden has sworn that on April 9, 1988, the day after the jury rendered its verdict, he received a telephone call at his home by an anonymous woman who stated that " 'we were pressured into making our decision' and that she wanted to let [Marden] know that she was sorry." [Motion Requesting Court Interview of Jurors and Incorporated Memorandum of Law, filed April 13, 1988].

Then on April 12, 1988, the prosecutor, Myles Malman, received a letter from an alternate juror Ms. Beverly Scott. Defendants contend that the letter indicates that the jurors considered the case before they were instructed to begin their deliberations. This is purportedly evidenced by the alternate juror making reference to the collective view of the jury by the use of the word "we." The letter states, *inter alia,* that

> we saw through most of the Defense attorneys and how they tried to pull our attention away from the facts by putting up smoke-screens or attacking you personally....
>
> *    *    *    *    *    *
>
> Third, we were wondering what became of Claudia Rodriguez?

[*See* Order, April 18, 1988, Attachment]. This letter also made reference to the "jury's view" of the prosecutor's presentation of the case, and that it was this alternate juror's personal opinion while the "facts alone were not sufficient," the prosecutor's presentation of them "got" the convictions. Other comments contained in the letter were clearly either the alternate juror's personal opinion, or the jury's collective view regarding matters wholly unrelated to the merits of the trial. For example, the alternate juror opined that the jury was impressed by the suits, ties and argyle socks worn by the prosecutor.

We find that the denial of the motion to interview the jurors does not raise a substantial issue on appeal. We are guided toward this conclusion by the recent case of *Tanner v. United States,* —— U.S. ——, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). There, the Supreme Court recognized the sound policy reasons for insulating a jury's deliberative process from public scrutiny in order to ensure finality in the verdict, as well as to maintain public confidence in the jury system. *Id.* at 2747 (*citing McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 784–85, 59 L.Ed. 1300 (1915); *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892)). Exceptions to the common-law rule that flatly prohibited juror testimony have been recognized "only in situations in which 'extraneous influence,' was alleged to have effected the jury." *Id.,* 107 S.Ct. at 2746.

Not surprisingly, a district court's decision whether to interview jurors must rest primarily on the evidence submitted as to an outside influence on the jury's deliberations. "[T]he decision to hold a hearing to determine juror misconduct is within the sound discretion of the trial judge ... [when] juror misconduct involves influences from outside sources, the failure of the trial judge to hold a hearing constitutes an abuse of discretion...." *United States v. Chiantese,* 582 F.2d 974, 978–79 (5th Cir.1978) (citations omitted), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979). Here, we have no indication that the jury was effected by external factors.

To begin with, we found that Marden's affidavit did not provide a compelling reason to interview the jurors and, in effect, pierce the deliberative process. We do not know who called Marden, or whether, in fact, it was a juror. The caller apparently did not identify herself as a juror. Second, even assuming *arguendo* that it was a juror—and there is little evidence to suggest that the call was made by a juror—there is no indication that any "pressure" was external to the deliberative process.

We recognize that the "pressure" to reach a verdict is inherent to the system, and the caller, even if a juror, could have been referring to the type of internal influence to which jurors simply cannot testify under Federal Rule of Evidence 606(b), and *Tanner*. Further, that the caller said she was sorry, can easily be read as an expresison of sympathy with the Defendant, as opposed to an apology for reaching a verdict on improper grounds. Most importantly,

> the anonymity of the call in our mind [ ] simply creates no burden to investigate. To require any investigation in the face of such unreliable accusations would place an imposing burden on the district court to risk jury contamination from the investigative process itself, when the court has no basis whatsoever to adjudge the reliability of the initial accusation.

*United States v. Caldwell*, 776 F.2d 989, 999 (11th Cir.1985) (*citing United States v. Sedigh*, 658 F.2d 1010 (5th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982)). While in this case there was no danger of contaminating *this* jury by an investigation because it had already reached its verdict, we believe that post-verdict juror interviews based on such wholly unreliable "evidence" fundamentally undermines the larger policy considerations expressed by the Supreme Court in *Tanner*.

The information contained in the letter sent by the alternate juror implicates different considerations. The premature discussion of a case by a jury can impinge on the Defendants' Sixth Amendment right to be tried by an impartial jury. *United States v. Edwards*, 696 F.2d 1277 (11th Cir.) (*citing Winebrenner v. United States*, 147 F.2d 322 (8th Cir.), *cert. denied*, 325 U.S. 863, 65 S.Ct. 1197, 89 L.Ed. 1983 (1945)), *cert. denied*, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983). Again, we find that we were not compelled to conduct interviews to determine whether jurors had discussed the case before it was given to them for deliberation. The alleged impropriety is that a juror may have formed an opinion too soon, and was therefore not impartial, and/or that unspecified jurors had failed to follow the court's instructions

not to discuss the case and to keep an open mind. Either tack leads us to the conclusion that the inquiry is fundamentally one that intrudes on the deliberative process. And, on this record, we find a wholly insufficient basis to do so. We add that the text of the letter does not explicitly indicate that the jurors *had* discussed the case prior to their deliberations.

"Cases dealing with the degree of investigation required fall along a continuum focusing on two factors: the certainty that some impropriety has occurred and the seriousness of the accusation." *United States v. Ayarza–Garcia*, 819 F.2d 1043, 1051 (11th Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987). Here, there is no certainty that an impropriety had occurred. The letter does not explicitly state that the jurors discussed the case before they began their deliberations. At most we could draw an inference that the jurors spoke about the attorneys and their trial strategy. However, from that inference, the conclusion is not inevitable that the jurors had prematurely formed an opinion and were partial.

In *Chiantese*, the defense attorney

> informed the court that he had observed a member of the jury conversing with another juror and two alternate jurors. The attorney also related that a student who had been working at his firm had overheard a juror state to two alternate jurors during cross-examination by [a co-defendant's] attorney, "Stupid. Stupid. He's a pain in the ——."

*Chiantese*, 582 F.2d at 978. The trial court declined to voir dire the jury to determine whether the statement had been made, and its possible effect. The former Fifth Circuit affirmed the trial judge, finding that the decision did not constitute an abuse of discretion. In reaching this decision the court found that the allegations did not "rise to the magnitude of the fundamental prejudice inherent in cases of outside influence.... [The juror's] observations related to an aspect inseverable from our adversary system of justice, an aspect we would be naive to presume is not considered by

jurors." *Id.* at 979. Further, the court determined that the statement did not indicate that the jurors had prematurely formed an opinion about the case or had improperly discussed the case among themselves, because the remark did not concern the merits of the defense, commit the juror to any outcome or demonstrate prejudgment. *Id.*

Likewise, in the present case the hypothetical discussion among the jurors would have pertained to the manner in which counsel conducted the trial. Even if these discussions took place, as indicated by *Chiantese*, they would not rise to the level of outside influence, and the letter does not demonstrate that the case was in any way prejudiced. Further, even if this alternate juror may have formed an opinion it is of utterly no consequence to the disposition of this matter because she was an alternate and was not involved in reaching the verdict. Moreover, we note that this jury *did* deliver not guilty verdicts as to some counts for most Defendants. That fact alone heavily militates against the belief that the jury had decided the case based on pre-deliberative conversations among themselves concerning the attorneys.

The question contained in the letter regarding Claudia Rodriguez did not require us to interview the jury. As with the purported conversation about the attorneys, any possible conversation about this Defendant, whose Rule 29 motion was granted by the Court at the close of the Government's case, is not the equivalent of an outside influence on the deliberative process. Rather such curiosity must be viewed as an inevitable part of the system. Further, after we directed a verdict in favor of the Defendant Rodriguez, we instructed the jury that they were not to consider her absence in their consideration of the case against the other Defendants. This prophylactic instruction was agreed to by all parties. We have no reason to believe that the alternate juror's simple question is indicative of a failure to heed that instruction and that this jury was somehow partial in their consideration of the case against Sokoloff, Griek or any other Defendant. Accordingly, we based our judg-

ment not to interview the jury on this: there was little, if any, certainty that any impropriety occurred, and the accusation itself was not particularly serious.

Further, even if we did interview the jury, the type of inquiry that would be required, based on this allegation, would have necessarily probed the jurors mental processes. *See Ayarza–Garcia,* 819 F.2d at 1051. "Resolving the question of whether jurors improperly disregarded the Court's instructions inevitably entails an anatomization of the thought behind the verdict," *United States v. Pavon,* 618 F.Supp. 1245, 1247 (S.D.Fla.1985), *aff'd,* 802 F.2d 1397 (11th Cir.1986), and is therefore an impermissible avenue of inquiry because such evidence cannot be used to impeach the verdict. *See also United States v. Darby,* 744 F.2d 1508 (11th Cir. 1984), *cert. denied,* 471 U.S. 1100, 105 S.Ct. 2323, 85 L.Ed.2d 841 (1985).

Finally, Defendants contend that the prohibition against allowing their counsel to interview jurors violates their First Amendment rights of speech and association. Local Rule 16 E of the Southern District of Florida provides in pertinent part that

> [b]efore, during, and after the trial, a lawyer should avoid conversing or otherwise communicating with a juror on any subject, whether pertaining to the case or not. Provided, however, after the jury has been discharged, upon application in writing and for good cause shown, the Court may allow counsel to interview jurors to determine whether their verdict is subject to legal challenge. In this event, the Court shall enter an order limiting the time, place, and circumstances under which the interviews shall be conducted. The scope of the interviews should be restricted and caution should be used to avoid embarrassment to any juror and to avoid influencing his action in any subsequent jury service.

Specifically, they maintain that this Local Rule inhibits "First Amendment activity [that] involves speaking with citizens, gathering information, and reporting it back to a court of law in order to petition for specific relief." [Memorandum in Support

of Motion to Interview Jurors and for Related Relief at 12].

However, we are not faced here with a broad-based attack on the constitutionality of this local rule, and we need not decide that issue now. Instead, we are only faced with the question of whether our denial of the Defendants' motion to interview the jurors raises a substantial question on appeal, and whether the conviction of these Defendants is likely to be reversed on the basis of this First Amendment argument. We find that the "challenge" to the Local Rule does not present a substantial issue.

The decision to allow juror interviews must rest, in substantial measure, on their anticipated results. That is, we do not hear the Defendants to contend that their First Amendment rights extend to communication with jurors for simply any reason. Instead, the fruit of that inquiry must relate to the legitimacy of the jury's verdict. As detailed at length above, inquiry for the purpose of uncovering the internal deliberative process would be useless because a verdict may not be impeached on that basis. *Tanner, supra;* Fed.R.Evid. 606(b). Defendants concede that "[t]he primary purpose of our request to interview jurors is to determine whether such 'extraneous prejudicial information' or 'outside influence' existed." [Defendants' Memo at 15]. After reviewing the evidence, we were satisfied that the anonymous telephone call to Defendant Marden, and the letter to the prosecutor provided no colorable showing that any external influence had affected the jury's verdict. That consideration remains the touchstone in determining whether it is appropriate to interview jurors, whether the request is premised on First, Fifth or Sixth Amendment grounds. Accordingly, it is

ORDERED AND ADJUDGED as follows:

1. Defendants' motion for bond pending appeal is DENIED;

2. Defendant Sokoloff shall voluntarily surrender to the designated prison facility fifteen (15) days from the date of this Order;

3. Defendant Griek shall voluntarily surrender to the designated prison facility thirty (30) days from the date of this Order.

## APPENDIX

## EXHIBIT A

United States of America, Plaintiff,

vs.

Jay William Marden, et al., Defendants.

## ORDER

Defendants have called Randy S. Fink as a witness in this matter. We have given the Defendants the opportunity to actually question Fink out of the presence of the jury. Mr. Fink has, we believe, properly invoked his Fifth Amendment privilege against self-incrimination, and this Court may not compel his response to the questions posed by defense counsel. We are satisfied that the truthful answers to the questions posed to Mr. Fink might reasonably tend to incriminate him.

On January 6 and January 10, 1986, Fink entered into a plea agreement wherein he agreed, among other things, to plead guilty to two counts of a four count indictment returned by a federal grand jury sitting in the Eastern District of Louisiana. In exchange for that plea, the government agreed to dismiss the other two counts, and further agreed that it would not pursue any other criminal violations, except for crimes of violence, in the Eastern District of Louisiana, and the Southern District of Florida involving narcotics violations and criminal tax violations. The plea agreement was predicated on Mr. Fink's cooperation in providing truthful testimony at debriefings and other proceedings. The United States Attorney for the Southern District of Florida has concluded that Fink has not been truthful in his "cooperation," and that the plea agreement, at least with this District, has been abrogated by Fink. Accordingly, the United States maintains that it may pursue the prosecution of Fink for violations of the narcotics and tax laws which may have occurred prior to the entry of the plea agreement, as well as potential prosecutions for making false statements.

Fink has appropriately invoked his Fifth Amendment privilege under *United States v. Fortin*, 685 F.2d 1297 (11th Cir.1982). The privilege against self-incrimination has been found to be waived "only in cases where the testimony sought '[could not] possibly [have been] used as a basis for, or *in aid of*, a criminal prosecution against the witness.'" *Id.* at 1298 (quoting *Brown v. Walker*, 161 U.S. 591, 597, 16 S.Ct. 644, 647, 40 L.Ed. 819 (1896)). And "[t]he privilege [against self-incrimination] attaches to the witness in each particular case in which he may be called on to testify...." *Id.*, 685 F.2d at 1298–99 (*quoting United States v. St. Pierre*, 132 F.2d 837, 839 (2d Cir.1942), *cert. dismissed as moot*, 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199 (1943)). In the present case, it is clear that for the reasons described below, this witness is rightfully in apprehension that his testimony could be used for, or in aid of a criminal prosecution against him.

First, Mr. Malman, the Assistant United States Attorney prosecuting the case, has represented that: Mr. Fink is a potential target of a criminal prosecution in the Southern District of Florida; that as far as his office is concerned the plea agreement with Mr. Fink has been abrogated; and that the United States could and would use his testimony here in this trial in a criminal prosecution against him in the Southern District of Florida. Moreover, Mr. Malman has represented that any testimony given by Mr. Fink could subject him to criminal prosecution under 18 U.S.C. § 1001, for giving false information to a federal agent either in March 1986 or December 1987 or January 1988.

The conclusion that Mr. Fink's testimony reasonably could subject him to prosecution is sound whether or not we would make an ultimate finding that the plea agreement was breached. Our review of Mr. Fink's 302 statements as recorded by the case agent from 1986, 1987, and 1988, however, indicate that in various interviews with federal agents, Fink did give conflicting statements as to matters material to the culpability of Defendants Sokoloff, Tomlinson and Hoover. He also presented inconsistent testimony as to the ownership of a vessel. We are satisfied that there is substantial reason to believe that any truthful testimony given by Mr. Fink as to these matters would probably conflict with at least some of those prior statements given to federal agents and subject him to potential criminal liability under 18 U.S.C. § 1001. *See Fortin*, 685 F.2d at 1298.

Further, our review of the 302's, as well as the testimony of Special Agent John Thompson and Mr. Malman satisfy us that there is a substantial basis to conclude that a breach of the plea agreement has occurred due to Mr. Fink's conflicting statements. Therefore, there is at least a real possibility that prosecutions could properly be instituted against Mr. Fink, not only for making false statements, but also for the violation of the narcotics and tax laws. We offer no opinion, of course, as to whether the government could use any prior statements made by Fink in any subsequent prosecution of Fink; nor, as to whether the government could satisfactorily establish Mr. Fink's involvement in the Marathon conspiracy independent of any information Fink may have provided. We find only, on the record before us, that there is substantial reason to believe that Mr. Fink materially breached the plea agreement, and that he surely has a good faith basis for invoking his privilege against self incrimination as to virtually all of the questions proffered by Defense counsel.

Finally, the questions posed by defense counsel, to which Fink invoked his privilege, centered largely, if not completely, on his knowledge and involvement with the purported narcotics smuggling operation. It is patent that since the plea agreement is probably no longer in effect, and that this witness is surely without immunity for statements pertaining to these matters, his testimony could possibly be used in aid of a prosecution against him. His privilege has been properly invoked.

The Defendants also have moved this Court to dismiss the indictment based upon prosecutorial misconduct. The gravamen of this motion is that by "the Government's *knowing, planned and intentional* actions, ... [the Defendants] would effective-

ly be denied of [their] right to Due Process, Compulsory process of witnesses, and ... Sixth Amendment Right of Confrontation." Specifically, Defendants contend that the government improperly used its prosecutorial power to keep Mr. Fink from testifying at this trial and providing exculpatory testimony. The abrogation by the United States Attorney for the Southern District of Florida of the plea agreement, entered in January 1986, has now forced Mr. Fink to invoke his Fifth Amendment privilege, thus insulating allegedly exculpatory evidence. The evidence presented does not support the Defendants' misconduct claim, and we reject it.

On the record before this Court, we find no evidence of bad faith on the part of the United States Attorney for the Southern District of Florida, or the Federal Bureau of Investigation. To the contrary, the evidence indicates that the government did not want to call as witness, Mr. Fink, who they believed would not testify truthfully. Fink's accounts of the operataion were apparently inconsistent in a number of significant ways, and the Miami prosecutors had informed the New Orleans prosecutors, long before the commencement of this trial, as to their belief that Fink was being untruthful and that, in their view, Fink had substantially breached the plea agreement. There is no convincing support in the record that the government sought to breach the agreement simply for the tactical advantage of keeping an exculpatory witness off the witness stand. We note in passing that the government itself created the records which reflect the inconsistencies in Fink's statements. Moreover, within this context, we find nothing improper in the prosecutor having given *Miranda* warnings to Mr. Fink on January 7, 1988. By so doing, the prosecutor fairly put Mr. Fink on notice that, at least as far as the Miami prosecutor was concerned, the plea agreement was abrogated because the government believed Fink had given misleading and conflicting testimony, and therefore that anything Fink said could be used against him. We think that by giving such notice to Fink, substantially in advance of trial, the government did no more than fairly comply with the requirements of *Miranda* and the Fifth Amendment. We reject the suggestion that by so warning the witness that the government somehow engaged in misconduct or violated the due process rights of the Defendants on trial. We add that the government promptly alerted counsel for defense, again, long before this trial, as to information it believed might be exculpatory in nature. (*See, e.g.,* Government Exhibit 1 at hearing of April 6, 1988). Moreover, we specifically credit the testimony of Agent Thompson and Mr. Malman, and accordingly we reject the contention that the government breached the agreement so as to deprive the Defendants of exculpatory evidence. We note, of course, that we have not had the opportunity of hearing any testimony from Mr. Fink as to these matters; but short of Fink waiving his Fifth Amendment privilege, or compelling his testimony under a grant of use immunity pursuant to § 6001 of Title 18, we know of no way to obtain that evidence.

Defendants rely on *United States v. Heller*, 830 F.2d 150 (11th Cir.1987), and cases cited therein, for the proposition that the government's improper influence of a defense witness requires the dismissal of the indictment. We find that these cases are inapposite.

In *Heller*, a federal agent threatened the defendant's accountant, "that the accountant might be aiding and assisting Heller in tax fraud and indicated that the accountant could be a defendant as well as Heller. [The agent] also acknowledged that he intended to scare the accountant.... [Moreover], the record [was] clear that the accountant testified falsely against Heller." *Id.* at 153. The Eleventh Circuit found that Heller had been deprived of an important witness because of substantial interference on the part of the government, and that, accordingly, defendant was entitled to a new trial.

The case at bar contains no evidence of the type of misconduct that the court in *Heller* found dispositive. Defendants contend that the government's failure to live up to its plea agreement with Mr. Fink is

the equivalent of intimidating this witness from testifying for the Defendants. We disagree. The plea agreement required Mr. Fink to give truthful testimony in exchange for the dismissal of two counts brought against him, as well as immunity from prosecution for narcotics and tax law violations in this district and elsewhere. The evidence submitted, including the 302 reports prepared by the F.B.I., indicates that the government does have substantial reason to believe that the information provided by Mr. Fink has not been truthful, and the plea agreement has been properly abrogated. From this, we cannot conclude that the government has abrogated the agreement, in bad faith, so that Mr. Fink could not testify in this case without providing self-incriminating testimony. The government here has not, as in *Heller*, intimidated Mr. Fink into refusing to testify, or testifying falsely. It simply has abrogated the plea agreement, we think in good faith, and plainly notified Fink of this view. Mr. Fink's decision to invoke his Fifth Amendment right flows directly from that decision.

Other cases do not compel a different result. In *United States v. Hammond*, 598 F.2d 1008 (5th Cir.1979), an F.B.I. agent approached a defense witness and told him that if he continued to testify "he would have nothing but trouble," *id.* at 1012, in an ongoing state prosecution of the witness. Because of this threat, that witness refused to testify further and another defense witness refused to testify at all. The former Fifth Circuit held that the governmental interference deprived the defendant of his due process rights and ordered reversal of his conviction. The facts in the instant case do not resemble those in *Hammond*. No witness here was approached by the government after he commenced his testimony.

In *United States v. Morrison*, 535 F.2d 223 (3d Cir.1976), the prosecutor in the case gave a defense witness repeated warning about the right not to give self-incriminating evidence "which culminated in a highly intimidating personal interview...." *Id.* at 227. The witness ultimately gave some testimony but invoked her Fifth Amend-

ment privilege with regard to much of the evidence the defendant had expected to put before the jury. The Third Circuit concluded that "[t]he pressure brought to bear on [the witness] by the Assistant United States Attorney interfered with the voluntariness of [the witness'] choice and infringed the defendant's constitutional right to have her freely-given testimony." *Id.* at 228.

Finally, in *United States v. Thomas*, 488 F.2d 334 (6th Cir.1973), the defendant's witness was initially willing to testify notwithstanding the advice that this testimony could lead to his prosecution for misprison of a felony. At a recess taken during trial, and granted to provide the witness the opportunity to consult with counsel, the witness was approached by a Secret Service Agent "who told him he *would* be prosecuted to misprison of felony if he testified in the case." *Id.* at 335. The Sixth Circuit determined that even assuming the good faith intention of the agent, no valid purpose was served by seeking out the witness and on an *ex parte* basis "gratuitously admonishing him...." *Id.* at 336.

The facts of this case differ materially from those recounted in the cases cited by Defendants. To begin with, we have been presented with no evidence that the prosecutor improperly threatened Mr. Fink, or that the prosecutor sought to abrogate the plea agreement for tactical advantage. Rather, the government has contended that Fink provided materially false and misleading information directly relating to a number of matters of real importance, and that it believed the agreement to have been breached precisely because of Fink's violation of the terms of the agreement. We are satisfied and find that this agreement has been breached not as a result of government misconduct, but rather because of the conflicting statements made by Fink. We add that none of the cases cited by Defendants involved the breach of a plea agreement by a cooperating witness who subsequently made several material and conflicting statements. Moreover, the evidence does not support the suggestion

1462

that the prosecutor made this decision on the eve of trial, but rather shortly after Mr. Fink provided the conflicting accounts to the F.B.I. case agent. The prosecutor properly and promptly informed Fink and his counsel of his concerns and views relating to the agreement. There can be no suggestion here that the prosecutor gratuitously sought out Fink and admonished him not to testify. Additionally, the prosecutor promptly notified defense counsel of potential *Brady* material in the case. We find no support in the case law for the proposition that the prosecutor was somehow bound to a plea agreement with a witness/target who may have been unworthy of belief. At all events the prosecutor, under these facts, was not required to put Fink on the stand to provide testimony which he had substantial reason to believe was untrue; nor was he required to enforce the terms of the agreement when he had substantial reason to believe that Fink had materially breached an essential clause requiring the witness to cooperate fully and testify truthfully. Accordingly, we find

1. Randy Fink properly invoked his Fifth Amendment right against self-incrimination because truthful answers to questions put to him by Defendants' counsel could expose him to criminal liability for violation of 18 U.S.C. § 1001, or perjury, or the underlying narcotics transactions.

2. This Court cannot compel Fink's testimony in light of the proper invocation of his Fifth Amendment right. The prosecution has asserted an actual basis to put this witness in real fear of exposure to criminal liability.

3. The proposition that the government proceeded in bad faith to keep exculpatory evidence from being introduced in this case is rejected. On the record presented to us, we are unpersuaded that there has been any due process violation in this case. Accordingly, Defendants' motion to dismiss is DENIED.

DONE AND ORDERED in Miami, Florida this 7 day of April, 1988.

/s/  Stanley Marcus
STANLEY MARCUS
United States District Judge
Southern District of Florida

EXHIBIT B

United States of America, Plaintiff,

vs.

Jay William Marden, et al., Defendants.

ORDER

Defense counsel seek to introduce testimonial evidence directly through Mr. Kaplan and through Mr. Miller's associate, Mr. Forman, which would allegedly tend to exculpate their respective clients Dade Sokoloff and Wilbur Hoover. The source of this evidence is conversations counsel had with Randy Fink, the purported leader of the "Fink Organization." Counsel seek to introduce, under Federal Rule of Evidence 804(b)(3), statements that Mr. Fink made to them, inasmuch as Fink has in good faith invoked his Fifth Amendment privilege against self incrimination and refused to testify at the trial.

This Rule allows hearsay evidence to be admitted into evidence when the declarant is unavailable to testify as a witness; the statement at the time of its making, so far tended to subject the declarant to criminal liability, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true; finally, and most importantly to the case at bar, a statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. For the reasons stated below, we find that the Fink hearsay statements are inadmissible.

Mr. Kaplan's proffered testimony would, in essence, indicate that he had met with Fink in jail on approximately five different occasions. His testimony would relate to their meeting at the Metropolitan Correctional Center on April 2, 1988. Kaplan proffered that Fink said that Defendant Sokoloff had participated in the Fink smuggling operation two or three times; that

Sokoloff lived in the Fink house in Coconut Grove during 1984; that Sokoloff could operate both boats competently; and could navigate around a sand bar and read a chart. Kaplan would further testify that Fink told him that his relationship with Sokoloff became strained in mid-July of 1985; that Fink needed Sokoloff to operate one of the boats for the Marathon load; that Sokoloff did not want to go, but Fink threatened him; and that in Fink's opinion Sokoloff ran the boat aground on purpose. Kaplan contends that this testimony would be relevant as to Sokoloff's defense of duress, the Defendant's state of mind, and also regarding a withdrawal from the conspiracy.

Mr. Miller proffered that he and Mr. Forman met with Mr. Fink on two occasions; once on January 6, 1988 and again on April 1, 1988. Mr. Miller said that in the discussions in both of these meetings Fink's statements were the same with regard to Defendant Hoover. Miller proffered that Fink told him that Hoover was a mechanic and hired for that purpose; that he never discussed narcotics with Hoover; that Hoover was hired to go from Coconut Grove to Marathon, and that Hoover was to and did get off the boat at Hawk's Key; Hoover did not have or operate a hand-held radio; that Hoover was not paid for the narcotics deal but only as a mechanic; that Fink never saw Hoover at the Marathon house; and, finally, that Hoover did not want, at first, to go on the Marathon load.

Based on these proffers, we must evaluate whether this testimony may be received under Fed.R.Evid. 804(b)(3). The first element is easily met. The declarant, Mr. Fink, is unavailable to testify as to these matters. He has been called as a witness by defense counsel and has properly invoked his Fifth Amendment privilege against self-incrimination. Accordingly, he is unavailable to testify at this trial.

The second question is whether these statements at the time they were made were against the declarant's penal interest; that is, could Fink reasonably have believed that these statements would tend to subject him to criminal liability. We note in

this regard that while all the statements attributed to Fink may not have been incriminating, taken as a whole, they do implicate him in a marijuana smuggling operation. *See United States v. Alvarez*, 584 F.2d 694, 699–700 (5th Cir.1978).

Central to the determination as to whether the statements were against Fink's penal interest, is the status of his plea agreement. This Court has conducted a lengthy hearing to determine whether the government had properly abrogated the agreement, entered in January of 1986, which, *inter alia*, gave Fink immunity from further prosecution in exchange for his truthful cooperation with the United States. We have determined that the government did properly abrogate this agreement in January of 1988 after it became apparent to the Assistant United States Attorney and F.B.I. agents that Fink had not provided truthful information. In January, AUSA Malman read Fink the *Miranda* warnings. Accordingly, at the time the statements were made to Messrs. Kaplan and Miller, in April 1988, Fink had real reason to believe that he may no longer have been shielded by the immunity provided by the plea agreement.

The United States has argued, and not without some force, that the validity of the plea agreement was unknown to Mr. Fink, and the parties to this suit, in April 1988, and remained unknown until this Court ruled on the issue. Therefore, Fink did have at least some legitimate reason to believe that when he spoke to defense counsel, he was still covered by the plea agreement. Considering, however, that the United States had told Fink that the agreement was abrogated, that he could be prosecuted for substantive narcotics violations, and had read him the *Miranda* warnings, we find that Fink's statements, generally, were ones that he could reasonably have believed would tend to subject him to criminal liability.

Under 804(b)(3) statements against penal interest offered as exculpatory evidence are admissible only when "corroborating circumstances clearly indicate the trustwor-

thiness of the statement." Such evidence is lacking here.

In *United States v. Bagley*, 537 F.2d 162 (5th Cir.1976), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977), the former Fifth Circuit stated "that the term trustworthiness has two distinct elements." *Id.* at 167. The question of whether the "statement offered to exculpate an accused was actually made," *id.*, need not concern us here. We find counsel's proffer to be creditable, and we have no reason to question that the statements Fink purportedly made were actually spoken.

Instead, our fundamental concern lies with the *reliability* of the *statements* which are being offered for their truth. A number of factors demonstrate to us that there is insufficient trustworthiness to receive these statements into evidence. First, and most importantly, is the setting in which Fink gave Kaplan and Miller these statements. The primary basis for the government's abrogation of its plea agreement with Fink was materially inconsistent statements which he gave to federal agents, and reflected in 302's, in January 1986, December 1987, and January 1988. This pattern casts substantial doubt on the veracity of any statement that is attributed to Mr. Fink. This consideration is particularly pertinent in regard to Mr. Kaplan's proffered testimony, because that testimony would involve the very subject of the conflicitng statements contained in the 302's, i.e., Sokoloff's involvement with the conspiracy. The FBI 302's and the testimony of Special Agent Thompson reveal that at one time Fink made no suggestion that his confederate, Sokoloff, had been threatened into participating in the Marathon conspiracy; still later Fink told the FBI flatly that he threatened Sokoloff's life, and thereby obtained Sokoloff's participation; and yet, shortly thereafter Fink said only that he implored Sokoloff to assist him inasmuch as Sokoloff had aided his ventures in the past and was a key member of the operations. Fink also made other materially inconsistent statements to the FBI in Miami. While Mr. Forman's proposed testimony would not directly conflict with any prior statements attributed to Fink, we note that taken in the context of various other conflicting statements, Fink's comments regarding Mr. Hoover must be viewed with suspicion as to their reliability and truthfulness. Still other material inconsistencies and conflicts in Fink's out-of-court declarations were presented to this Court. Moreover, these statements were made to Defendants' attorneys representing co-conspirators. Fink could conceivably have some reason to exculpate these particular Defendants, that would lead him to speak less than truthfully, or at least some motive to lead his co-conspirators to believe that he wanted to exculpate them. The requirement that the out-of-court statement be bolstered by sufficiently corroborating circumstances simply has not been met here.

Further, other indicies of reliability are not present. The statements were not made under oath, and there is no opportunity for the fact-finder to observe the demeanor of the declarant. Cross-examination of the statements is impossible. Also, the statements of Fink are not the exclusive source of the purportedly exculpatory information available to the defendants. Among others, the Defendants themselves could, although, of course, they may not be compelled to testify as to these matters. Moreover, other witnesses may have been called to testify as to some of the relevant facts and circumstances.

Prudential considerations also militate against allowing this testimony. The Code of Professional Responsibility clearly speaks against allowing an attorney to act as both an advocate and a witness at trial. This problem would be particularly acute with regard to the Defendant Sokoloff, since Mr. Kaplan, after testifying as to matters related to his client's defense, would be in the position, in closing argument, of urging acquittal based, in substantial measure, on his own testimony. To the extent this problem could possibly be avoided by severing these Defendants and having separate trials with different counsel, we note that this issue has been raised only now, in the third week of trial, a time that would make such a "curative" action, on such a slim basis, unreasonable. We add that defense counsel's interviews with Fink substantially pre-date the trial of this case.

Indeed Mr. Kaplan indicated that his first discussions with Fink occurred sometime in November 1987. Finally, if the "Fink hearsay" were admitted, the government would rightly seek to impeach Fink's credibility by offering still other inconsistent out-of-court Fink declarations. We think that this would create a real danger of confusion, and that the center of gravity of this trial would shift markedly to an examination of the credibility of Fink's multiple out-of-court statements by allowing other witnesses to recount what Fink may have told them on a number of occasions.

The central problem is that the Rules of Evidence properly require sufficient indicia of reliability and trustworthiness before such otherwise hearsay statements may be admitted for the truth of its contents. The Defendants have been unable, in our judgment, to establish that reliability on the record before us.

For all the reasons detailed, the application to permit Messrs. Kaplan and Forman to testify as to Fink's out-of-court statements to them is DENIED.

DONE AND ORDERED in Miami, Florida this 13 day of April, 1988.

/s/ Stanley Marcus
  Stanley Marcus
  United States District Judge
  Southern District of Florida