**Ricardo Aldape GUERRA, Petitioner,**

v.

**James A. COLLINS, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.**

Civil A. No. H–93–290.

United States District Court,
S.D. Texas,
Houston Division.

May 18, 1995.

Scott J. Atlas, Vinson & Elkins, Houston, TX, for Ricardo Aldape Guerra.

Bob Walt, Assistant Attorney General, Austin, TX, Mary Lou Soller, Attorney at Law, Washington, DC, for James A. Collins.

William C. Zapalac, Assistant Attorney General, Austin, TX, for Wayne A. Scott.

## AMENDED ORDER ON APPLICATION FOR WRIT OF HABEAS CORPUS

HOYT, District Judge.

This case is before the Court pursuant to the application for a writ of habeas corpus filed by the petitioner, Ricardo Aldape Guerra. This Court granted the petitioner's motion for an evidentiary hearing and pursuant thereto, received documentary and testimonial evidence. Having reviewed the writ application, the response, the state trial record, the exhibits introduced into evidence and the testimony presented at the evidentiary hearing, the Court is of the opinion that the writ shall be granted.

## I.

### Factual and Procedural History

On July 13, 1982, J.D. Harris, a Houston police officer, was on a patrol in a Hispanic neighborhood. Around 10:00 p.m. a pedestrian, later determined to be George Lee Brown, waved down officer Harris complaining that a black and burgundy Cutlass automobile had almost run him over while he was walking his dog. Within minutes, officer Harris approached a stalled vehicle fitting the description given to him by the pedestrian.

The vehicle was occupied by Ricardo Aldape Guerra and Roberto Carrasco Flores, undocumented workers, who lived in the

neighborhood. Pursuant to officer Harris' command, the occupants approached officer Harris' vehicle. The second occupant pulled a nine-millimeter Browning semi-automatic pistol and shot officer Harris three times. It is undisputed that the weapon was owned by Carrasco. At the time of the shooting, the first occupant had placed or was placing his hands on the hood of officer Harris' vehicle in obedience to officer Harris' command. As the individuals fled the scene of the crime, the second occupant fired a nine-millimeter pistol into an approaching vehicle shooting Jose Armijo, Sr., in the presence of his two children.

It is undisputed that Carrasco wore a maroon shirt and brown pants and that Guerra wore a light green shirt and blue jeans. Carrasco was also known in the neighborhood as "Guero" or "Wero" because of his light-skin. As well, he was clean-shaven and had short hair; Guerra, on the other hand, had black, straight, shoulder-length hair, a mustache, and a beard.[1]

Within an hour of the shooting, Carrasco was killed in a shootout with police, but not before he shot and seriously wounded another police officer with the same weapon used to kill officer Harris and Mr. Armijo. Officer Harris' weapon, a .357 Colt Python, was found in Carrasco's waistband when his body was searched or examined at the morgue. Also discovered was an additional "ammo" magazine for the nine-millimeter pistol in a "military-type" magazine pouch attached to Carrasco's belt.

Guerra was arrested shortly after Carrasco was killed, while hiding beneath a horse trailer. He was unarmed at the time, although a .45–caliber Detonics pistol was found lying under the trailer, wrapped in a bandanna. After he was arrested, he was taken to the crime scene where spectators had gathered and witnesses were being identified and questioned. Later, he was taken to the police station.

Guerra was tried for the offense of capital murder and was convicted on October 12, 1982. On October 14, 1982, he was sen-tenced to death by lethal injection. His conviction was affirmed on May 4, 1988, by the Texas Court of Criminal Appeals in *Guerra v. State,* 771 S.W.2d 453 (Tex.Crim.App.1988) (*en banc* ), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3260, 106 L.Ed.2d 606 (1989).

On September 21, 1992, the state trial court denied Guerra's application for writ of habeas corpus, as well as his request for an evidentiary hearing and failed to enter findings of fact. Guerra's case was automatically forwarded to the Texas Court of Criminal Appeals, which adopted the trial court's recommendation in an unpublished, per curiam, order. Guerra then filed this application for a federal writ of habeas corpus.

## II.

### Petitioner's Contention:

In his several arguments, Guerra contends that he was denied a fair and impartial trial because of: (a) pretrial intimidation of witnesses; (b) an improper identification procedure; (c) the prosecutors' failure to disclose materially exculpatory evidence; (d) the prosecutors' use of known false evidence and known illegitimate arguments to the jury; and, (e) the cumulative effect of the prosecutorial error.

Each of these contentions and the relevant evidence will be addressed in turn. To assist the reader in following this discussion, it should be noted that the evidence consists of (a) the statements of witnesses taken on the morning following the shooting; (b) the trial testimony in the underlying conviction; and (c) the testimony taken in this proceeding.

Restated, Guerra complains that he was brought to the crime scene and location of the witnesses in handcuffs; at the police station, he was twice escorted past the witnesses with handcuffs and bags over his hands; at the lineup, he was the sole Hispanic on exhibition with long-hair; before, during, and after the lineup, the witnesses were permitted to communicate amongst themselves, with one particular witness urging the

[1]. These characteristics and features are important because the identity of the "shooter" was in dispute.

others to identify Guerra as the shooter; at a reenactment of the crime and at a pretrial weekend meeting of the witnesses, the prosecutor told the witnesses that Carrasco was dead and that Guerra was the shooter; at the trial, two life-size mannequins were stationed in front of the jury from the beginning to the end of the trial. Finally, Guerra argues that the prosecution failed to disclose materially exculpatory evidence and used evidence known to be false, or half truths, to convict him. The cumulative effect of all of these actions resulted in a violation of his "due process" rights and the fundamental right to a fair procedure leading up to trial.

## III.

### Pretrial Intimidation of Witnesses:

*III(a) The Petitioner's Contentions:*

The petitioner contends that several, if not all, of the witnesses were intimidated by the police and the prosecutors, the result of which was that the witnesses either gave contradictory testimony, or their testimony was presented in a manner that shaded the truth. On the question of intimidation, the petitioner called several witnesses who were under the age of 18 at the time: Patricia Diaz (age 17); Elena Holguin; Frank Perez (age 17); Herlinda Garcia (age 14); Jose Heredia (age 14); and Elvira Flores (age 16).

The evidence is undisputed that the witnesses were brought to the police station before midnight on July 13, 1992. They remained until about 6:30 a.m. the next morning. The petitioner asserts that in addition to lack of sleep, the ability to coerce and intimidate the witnesses was made easy by three other factors common to most of the key witnesses, i.e., their inability to speak fluent English, their lack of education, and their youth.

The native language of all but one of the neighborhood witnesses is Spanish and, at the time, many of the witnesses had little or no command of the English language. These facts, coupled with the lack of formal education, according to the petitioner, created a situation where the witnesses' statements as taken lent themselves to selective interpretations. These circumstances, according to the petitioner, set the tone for how the witnesses were handled.

*III(b) Federal Habeas Testimony:*

During the federal evidentiary hearing, Patricia Diaz, a minor in 1982, testified that she told police officers at the crime scene that she did not see the shooting, but only got a glimpse of Guerra's profile after she heard the shots. She told them that Guerra's hands looked empty. One of the police officers, using vulgar language, insisted that Diaz had seen more and threatened to take away her infant daughter unless she cooperated. While still at the crime scene, Diaz saw another officer yelling at, handcuffing, and placing her aunt, Trinidad Medina, into a police car.

Diaz also testified that at the pretrial weekend meeting, held shortly before trial, the prosecutors also yelled at her, insisting that she change her testimony in some respects. She also told the prosecutor that she never saw Guerra pointing at officer Harris.[2]

Elena Holguin also testified at the trial and this proceeding. She stated that she was in her home at the time of the shooting. After she told police officers that she had not seen officer Harris get shot, one of the police officers became angry and told her that she had a duty to help them. Because of her alleged uncooperativeness, she was handcuffed, without provocation or justification,

---

2. During Diaz' testimony the prosecutor, on several occasions, altered the testimony by question and reaffirmed it again and again. For example:

Q. "Could you see or make out, Patricia, what type of object, if anything, this man had in his hand?" (p. 314, L. 6)
Q. "Could you see which way this man went after he pointed at the police officer like you have shown the jury. . . .? (p. 315, L. 2)

Q. "Now, could you describe this man you saw pointing at the police officer . . .?" (p. 316, L. 12)
Q. "Does that look a lot better, like the way he looked that night he was pointing at the police officer?" (p. 318, L. 4).
The record shows that Diaz never saw either man pointing at the police officer, only at the car. Further, she never saw any object. *See also* text accompanying note 10 at pp. 40–41 *infra.*

and placed into a police car. She was taken to the police station barefoot because the police would not permit her to get her shoes. She further testified that, in total, she was kept in handcuffs for more than two hours and they were not removed until she reached the police station.

Frank Perez testified that shortly after Harris was shot, a police officer pointed a gun at an unidentified Hispanic male, told him to lie down on the ground and yelled: "Why did you kill the cop?" The man on the ground was neither Carrasco nor Guerra. He also testified that at the pretrial weekend meeting, he told the prosecutors that, shortly after officer Harris was shot, a man who looked like Carrasco had run past him and pointed an object at him that appeared to be a nine-millimeter gun. In response, the prosecutor insisted that if Perez was less than "100%" certain that the object was a gun, he should not testify that the object pointed at him was a "gun," just an "object."

Jose Luis Luna was called to testify, as well. He testified that after officer Harris had been shot, but shortly before Carrasco was killed, police officers came to his home at 4907 Rusk, with guns drawn. The police officers ordered J. Luna and Jose Manual Esparza outside, forced them face down on the front porch, pointed guns at their heads, put a foot on them and cursed and screamed at them, while they searched the area.

Roberto Onofre testified that he witnessed this event between the police, J. Luna and Esparza as he was returning to the house that he shared with them. Onofre also testified that after Carrasco was killed, two police officers returned and questioned himself, Jose Luna, Jose Esparza and Enrique Torres Luna. During this exchange, the officers screamed, cursed, and threatened to arrest them if they did not tell what they knew. Several police officers then entered the house and searched it.

Onofre and J. Luna both testified that several times during July, after Carrasco's death and after the arrest of Guerra, police officers came to their home after midnight while they were asleep, entered the house, conducted themselves violently and used abusive language. They would order the residents to sit in the living room while they searched the house, kicking items out of the way and tearing up any newspaper clipping about Guerra. Although Onofre signed a consent to search at the time, he testified that he did so only because of the police officers' conduct, their actions toward the residents, and their mannerisms.

Herlinda Garcia, 14 years old at the time, testified that she told the police that Carrasco was the shooter. At that time, several police officers told her she would be arrested and jailed unless she cooperated. An unidentified police officer stated to her "that she just did not know what all could happen to her and her husband." At the time, Garcia's husband was over 18 years and on parole. She testified that she took these comments as a threat to reincarcerate her husband on rape charges if she did not say what was expected of her.

At the pretrial weekend meeting, after Garcia told one of the prosecutors that Guerra was not the man who had shot officer Harris, the prosecutor told her that she was confused and that she could not now change her mind because she had already made a statement identifying Guerra as the shooter, not only of officer Harris but also Mr. Armijo.[3]

---

**3.** The statement referred to by the prosecutor states in relevant part:

"This evening sometime after 10:00 p.m. my sister and me (sic) were going to the store. . . . My sister and I was (sic) walking down the sidewalk when I remembered that I had left my money. . . . I ran home to get my money. . . . When I got back to my sister we saw this black car turn off of Walker on to Lenox street rear (sic) fast. . . . As the car was getting ready to back up a police car . . . pulled in behind it."

". . . [H]e told the men in the black car to get out of the car. . . . Both men came out of the car on the driver's side. . . . [H]e told them to put their hands on the hood. . . ."

"Before I got a chance to move I saw this guy with the blond hair reach into the front of his pants and pull out a pistol and shoot the policeman. . . . The man with blond hair came after me shooting at me. . . . [H]e then shot the man in the read (sic) car." [Mr. Armijo]

". . . I did not get to see the other man and I do not know what happened to him . . . the man that shot the policeman . . . was wearing brown pants and a brown shirt that was open all the way down."

George Brown testified that after Mr. Armijo was shot, he was left in his car, without medical attention, for over an hour. However, officer Harris was immediately taken to the hospital within a few minutes after the ambulance arrived.[4] For the four to six hours leading up to the lineup at 6:00 a.m., Brown was kept separate from the other Hispanic witnesses, they were seated on a bench in a hallway outside the Homicide Division office. He attributes this segregation to the fact that his last name is of European origin. He could, nevertheless, overhear them talking among themselves about the shooting.

Garcia also testified that while at the police station she overheard police officers tell several of the Hispanic witnesses not to discuss the case with anyone, except the police and the prosecutors, and especially warned them not to talk to Guerra's lawyers or "they [the witness] could get in trouble." In addition, Garcia and several of the other witnesses testified that at the pretrial weekend meeting one of the prosecutors pointed to a picture of Carrasco and stated to the witnesses that the man in the picture was the man who died in the shootout with police. They then pointed to a picture of Guerra and said that he was the man who shot and killed officer Harris and Mr. Armijo.

*III(c) Discussion and Conclusion:*

■ Intimidation by the police or prosecution to dissuade a witness from testifying or to persuade a witness to change his testimony, when combined with a showing of prejudice to the defendant, violates a defendant's "due process" rights. *See United States v. Heller,* 830 F.2d 150, 152–53 (11th Cir.1987). This was the case in *Heller,* where the Court found that threats by a government agent caused a witness to give false, damaging testimony. *See also Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). Thus, the government does not have the unfettered right to interfere with any witness, particularly, in making the choice to testify or not. *United States v.*

*Hammond,* 598 F.2d 1008, 1012–13 (5th Cir. 1979). Where interference occurs by the police, police actions that intimidate witnesses may be imputed to the state in its prosecution. *Cf., Fulford v. Maggio,* 692 F.2d 354, 358 n. 2 (5th Cir.1982), *rev'd on other grounds,* 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983). Equally so, the state has a duty to disclose such conduct. This duty is imposed not only upon its prosecutor, but upon on the state as a whole, including its investigative agencies. Therefore, if a confession is in the possession of a police officer, constructively, the state's attorney has both access to and control over the document. *Id.*

■ It is clear to this Court that the mood and motivation underlying the police officers' conduct arising out of this case was to convict Guerra for the death of officer Harris even if the facts did not warrant that result. The Court finds and holds that the police officers and the prosecutors intimidated witnesses in an effort to suppress evidence favorable and material to Guerra's defense. Specifically, the written statements that were taken after the line-up are in many respects in significant contrast to those taken before the line-up. The Court attributes this to the fact that Carrasco had been killed and the strong, overwhelming desire to charge both men with the same crime, even if it was impossible to do so.

In addition to the scurrilous conduct exhibited by the police, the Court is confounded by the fact that the police would handcuff two innocent women, threaten to revoke the parole of another's common-law husband, and repeatedly, day after day in the early morning hours, search the residence of innocent people. This conduct alone speaks volumes about the intimidation suffered by these children who were caught up in the police net and the circumstance.

The prosecutors' conduct was equally rank. Before and during the trial, questions to the witnesses were stated in such a manner that the questions stated or implied complicity by Guerra, irrespective of the fact that the an-

---

4. Mr. Armijo was still alive during this time and was kept at the scene, according to police, because they thought that he had shot officer Har-ris. This delay by police quite possibly resulted in the death of a key witness.

swers did not conform. The tone of voice, as well as the artful manner in which the questions were asked, left little room for truthful answers or explanation. When the answers were not to their liking, they resorted to ridicule. Such conduct severely prejudiced Guerra's right to a fair trial and, therefore, violated his right to "due process" of law. *See Heller*, 830 F.2d at 152–53; *United States v. Smith*, 577 F.Supp. 1232, 1236–38 (S.D. Ohio 1983); *see generally Webb*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *cf., Hammond*, 598 F.2d at 1012–13.

The Court concludes that the pretrial intimidation of the witnesses, most of whom were children, resulted in violating Guerra's right to fundamental "due process" and a fair trial.

## IV.

### Improper Identification Procedures

*IV(a) The Legal Standard:*

The Supreme Court has adopted a "totality of the circumstances test" to be utilized in the analysis of identification testimony. Identification testimony is admissible if it appears "reliable," even if it is flawed by improper police behavior. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Thus, an unnecessarily suggestive identification is not subject to a "per se" exclusion. *Id.* The Court must determine whether an identification procedure constitutes a denial of "due process." In doing so it must first be determined whether the pretrial identification was unnecessarily suggestive. Assuming that it was, the Court must then determine whether the identification was so unreliable that the defendant's "due process" right to a fair trial would be precluded if the identifications were permitted. *Id.*

The factors to be considered in evaluating the reliability of an identification are: (i) the witnesses' opportunity to view the accused at the time of the crime; (ii) the witnesses' degree of attention; (iii) the accuracy of the witnesses' prior description; (iv) the level of certainty demonstrated at the confrontation; and (v) the time between the crime and the confrontation. *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).

Where the state's use of pretrial identification procedures posed a substantial likelihood of tainting the state witnesses' identifications of the defendant and both their out-of-court and in-court identifications are not shown to be independently reliable, the Court must determine if admission of the identifications into evidence is harmless error. *See Young v. Herring*, 917 F.2d 858, 864 (5th Cir.1990), *superseded on reh'g on other grounds*, 938 F.2d 543 (5th Cir.1991) (en banc), *cert. denied*, 503 U.S. 940, 112 S.Ct. 1485, 117 L.Ed.2d 627 (1992) (citing *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967)). When the state is the beneficiary of any error, the burden of proving that the error was harmless, beyond a reasonable doubt, rest at the state's door. *Thigpen v. Cory*, 804 F.2d 893, 897 (6th Cir.1986), *cert. denied*, *Foltz v. Thigpen*, 482 U.S. 918, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987) (citing *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828).

*IV(b) Discussion:*

The facts of this case present a situation that is somewhat peculiar to the *Brathwaite* case. Here, the facts show that the petitioner was known in and around the neighborhood, therefore, it was logical that the witnesses could identify the petitioner as being at the scene when officer Harris was shot. Moreover, Guerra's presence at the scene is not in dispute. Guerra gave a statement to that effect on the evening of the shootings. What is confounding is that the police took statements shortly after the shooting. Several were essentially exculpatory of Guerra, and others described the shooter in ways that blended characteristics of both men; *none* pointed unequivocally to Guerra. After learning of Carrasco's death and after the lineup, the police took additional statements that contradicted or impeached the prior statements in some subtle and other not so subtle ways.

In this regard, the record shows that there were at least eight witnesses who claim to have seen officer Harris shot: Hilma G. Gal-

van, Herlinda Medina Garcia, Jose Francisco Armijo, Jr., Elvira Medina Flores, Patricia Ann Flores Diaz, Jacinto Vega, and Jose and Armando Heredia. When these persons gave their first written statements, between 12:00 a.m. and 1:00 a.m., they stated in relevant part the following:

... "I know the one that shot the officer by sight...." The shooter "was wearing dark brown pants and a dark brown or black shirt. He (sic) tall and thin and has shoulder length straight blond hair." (Hilma G. Galvan at 12:05 a.m., July 14, 1982).

\* \* \* \* \* \*

... "I saw the guy with the blond hair reach into ... his pants and pull out a pistol and shoot the policeman.... He was wearing brown pants and a brown shirt that was open all the way down." (Herlinda Medina Garcia, at 12:12 a.m., July 14, 1992).

\* \* \* \* \* \*

... "The man shot the gun with his left hand.... I didn't see the men that shot the policeman too good and I don't remember what they looked like or what they were wearing...." (Jose Francisco Armijo at 12:15 a.m., July 14, 1982).

\* \* \* \* \* \*

... "Both the driver with blond hair and the passenger ... put their hands on the police car.... At this time the blond-haired driver pulled a pistol ... and started shooting at the police officer.... I don't think I can identify the two persons I saw...." (Elvira Medina Flores at 12:40 a.m., July 14, 1982).

\* \* \* \* \* \*

... "I told the detective that the man that was standing fourth from the left was the same man that I had seen on Walker.... I guess he had a gun in his hand." (Patricia Ann Flores Diaz, second statement, at 6:20 a.m. July 14, 1982).[5]

\* \* \* \* \* \*

... "One of the Mexican[s] ... put his hands on the hood of the police car as if he was under arrest. The other Mexican ... walked up behind the first Mexican ... and all of a sudden ... pulled a pistol out from somewhere and shot at the police officer about four (4) times.... The first Mexican ... was the one who had his hands on the hood of the police car and he would have been the driver of the car.... [T]he one who shot the police was the passenger of the car.... I never got to see their faces so I cannot recognize them if I ever see them again. I cannot remember what they looked like and cannot remember what either one was wearing." (Jacinto Vitales Vega at 12:10 a.m., July 14, 1982).

\* \* \* \* \* \*

... "The man that was driving the car came out of the car and to where the policeman was at.... [T]he other man in the car ... came out of the car and walked up behind the policeman and shot him.... I didn't get to see the man's face that was shooting the policeman." (Jose Angel Heredia at 4:15 a.m., July 14, 1982).

\* \* \* \* \* \*

.... "The man that shot the police officer I know him as Wedo (sic). I have known him about a month. As soon as he got out of the car I recognized him. He was also the man that ... shot the policeman." (Armando Heredia at 4:35 a.m. July 14, 1982).

\* \* \* \* \* \*

Two others gave relevant statements that bear upon the identification issue because of their proximity in time and circumstances to the events. John Reyes Matamoros and George Lee Brown gave statements before the lineup. In relevant part they state:

"I was able to see one of the men that had gotten arrested [after Carrasco was killed] and he was the man that was sitting in the front passenger seat [between 9:45 p.m. to

---

5. Diaz's first statement, given at 1:40 a.m., described the shooter as a Hispanic male with "collar length black hair and was wearing a long sleeve, dark colored shirt." By the time Diaz gave her second statement she was unsure which of the men had shot the officer. For sure she did not know whether Guerra even had a weapon.

10:00 p.m.]....." (George Lee Brown at 12:40 a.m., July 14, 1982).

\* \* \* \* \* \*

"The man I saw running with the gun was a mexican american (sic) about 20 or 21 years old. He had shoulder length hair that was not as dark as mine and it looked more like hair that a white person would have. He was wearing a button up shirt and brown pants....." (John Reyes Matamoros at 12:10 p.m., July 14, 1982).

Several of the witnesses knew Guerra from the neighborhood. For the police to utilize this familiarity in the reckless manner that it did, is troubling. In fact, the state used a host of improper identification procedures in an effort to manipulate the witnesses' statements and testimony. Notably suggestive were (i) permitting the witnesses to see the petitioner in handcuffs on several occasions while the witnesses were waiting to view the lineup, and (ii) permitting the witnesses to talk about and discuss identification before, during and after the lineup.

The prosecutors joined the hunt by conducting a reenactment of the shooting shortly after the incident with various chosen witnesses participating. This procedure permitted the witnesses to overhear each others view and conform their views to develop a consensus view. At the pretrial weekend conference, the prosecutors presented the two mannequins intended for use during trial. These life-size mannequins, created in the images of Guerra and Carrasco, were utilized then and throughout the trial to reinforce and bolster the witnesses' testimonies. The effect of these impermissibly suggestive procedures also resulted in a denial of "due process", as evidenced by the witnesses' federal habeas testimony.

The habeas testimony reveals that Guerra, handcuffed and with paper bags over his hands, was walked and shoved down the hallway outside the Homicide Division offices past the witnesses. He was then taken from the Homicide Division offices to the photo lab, where his clothes were taken from him. On both occasions, he was escorted along the hall before Diaz, Flores, Garcia, Jose, Jr., Galvan, Medina and Perez.

Before the lineup, witnesses either described the shooter in such a way that the description fit only Carrasco, i.e., he had blond-like hair and wore brown pants and a brown/maroon shirt, described a composite of both men, or described what could have been either man. While both Carrasco and Guerra had dark hair, the use of Carrasco's nickname, "Guero," which means "light-skinned" or "light-colored, blond-like hair," to describe the shooter may have confused the police interviewers. Clearly, the word "blond" did not describe Guerra's dark brown hair. Jose, Jr., who was 10 years old at the time, could only identify the shooter as being left-handed. This description was critical because Carrasco was left-handed. After the lineup and, with the knowledge that Carrasco was dead, several of the witnesses gave a series of second statements declaring, in spite of numerous previous assurances to the contrary, that Guerra was the shooter.

The various testimonies also show that Galvan spent most of her time in the hallway talking to Jose, Jr., and Flores. Although a general instruction or warning against talking was given, Galvan continued. She pointed toward Guerra and said to Jose, Jr., and Jose and Armando Heredia, in Spanish, loud enough for all the witnesses and the officers in the room to hear, that since Carrasco had died, they could blame the man who "looked like God" or the "wetback" from Mexico for the shooting of officer Harris. Based on her various accounts, Galvan's statement, that she actually witnessed the shooting, is suspect. Nevertheless, she encouraged the minors to identify Guerra as the shooter knowing that Guerra did not fit even her own description of the shooter.

She continued by stating that Mexicans only come to the United States to commit crimes and take jobs away from United States citizens. She repeatedly referred to Mexican Nationals as "Mojados" or "wetbacks". She was also heard repeatedly telling Jose, Jr., that Guerra was the killer. This conduct can be attributed only to her prejudice toward Mexican Nationals who, as Galvan stated, "took the jobs from Americans." The Court concludes that these expressions of prejudice against undocumented

aliens was, as likely as any, the motivation for the inconsistencies between Galvan's own statement and her testimony.

Galvan's influence also explains how Jose, Jr.'s testimony was so specific and direct when he was overheard in the hallway at the police station admitting that he had not seen Guerra or Carrasco clearly enough to know which had fired the shots. In fact, Jose, Jr. admitted in his trial testimony (pp. 302–03, 307–08) that he had not seen who shot his father because his father had pushed him below the dashboard as the shooting commenced. He repeated his inability to identify the shooter while he was sitting in the hallway outside the Homicide Division upon seeing Guerra during the lineup.[6] It is more likely so than not, that Jose, Jr.'s belief that Guerra was the shooter was a result of seeing Guerra in handcuffs at the police station and hearing Galvan, repeatedly, insist that Guerra was the shooter.

During the trial, the prosecutors placed the mannequins in front of the jury and they remained there during the testimony of the witness. Heredia and Perez testified that during the trial, the positioning of the mannequins helped them identify which of the men was dead. [The Carrasco mannequins' shirt had bullet holes and blood stains, while the shirt on the Guerra mannequin did not.] Donna Monroe Jones, a juror during the trial, also testified. She testified that the jurors noticed that the shirt on the Carrasco mannequin was blood-stained and bullet-riddled. Additionally, she testified that the mannequins made the jurors feel uncomfortable and ill at ease.

Given the undisputed facts leading up to and surrounding the lineup, the identification of Guerra at the lineup was predestined. After all, he was present at the time of the shooting. To then use that fact as the sole basis to prosecute him for capital murder, is more than a stretch. Under the "totality of

the circumstances," the identification procedures used by the police and the prosecutors were so corrupting that it caused witnesses, who either knew otherwise, or did not know at all, to testify that Guerra had committed the crime.

It is also relevant that the police officers and the prosecutors did not quiet Galvan and others, as they commented before, during and after the lineup. It is relevant to this inquiry, as well, that the prosecutors misused the identification of Guerra so as to violate his right to a fair trial. So, different from *Thigpen* and *Neil*, it is the effects of these draconian procedures and the results attendant to this abuse of power, that are arresting.

■ The pretrial use of the mannequins in the meeting with witnesses at the prosecutors' office the weekend before trial was certain to reinforce the consensus facts so that there would be complete harmony in the testimony. The unrestricted, incessant presence of the mannequins, one wearing a bullet-riddled, blood-stained shirt that the jurors and witnesses saw daily, violated a constitutional guarantee of a fair trial, by injecting impermissibly suggestive factors into the trial process. *Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S.Ct. 1340, 1346–47, 89 L.Ed.2d 525 (1986).

It was no mystery to the state that their entire case against Guerra rested on the witnesses identifying him. The state had to count on the eyewitnesses excluding from their testimony, facts that clearly pointed to Carrasco.[7] Therefore, the state, to seal its victory, deliberately chose to taint the identification process by insisting upon perjured testimony. The physical evidence equivocally pointed to Carrasco as the shooter. The statements taken before the lineup make it abundantly clear that the witnesses either identified Carrasco as the shooter or described a composite of both men. It was

---

**6.** It was argued by the state that Jose, Jr. became fearful when he saw Guerra and did not want to tell all that he knew. It was later, when he had gathered himself that he had the courage to come forward. However, the court had the benefit of a news clip in which Jose, Jr. was featured and related the incidents to the news media the day after the shooting.

**7.** Richard Bax, one of the prosecutors in the 1982 trial, conceded "the physical evidence ... totally pointed towards Carrasco Flores as being the shooter...."

only after the unexplained misconduct by the police officers, the permitted misconduct on the part of Galvan, and the reinforcement by the prosecutors, that Guerra was chosen as the shooter.

### IV(c) Conclusion:

The state has the burden of proving, beyond a reasonable doubt, that the intentional act of causing to be admitted tainted, unreliable and perjured testimony, identifying Guerra as the shooter, was harmless. *Thigpen,* 804 F.2d at 897 (citing *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828). The state has offered no evidence to contradict this point and has failed to discharge its duty.

### V.

### Failure to Disclose Materially Exculpatory Evidence

### V(a) The Legal Standard:

 There is long standing authority for the principle that, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). In order to establish that evidence falls within the purview of *Brady,* a petitioner must establish that the evidence was suppressed and that it was material and favorable. *Id.* Suppressed evidence is "material" if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985).

### V(b) Discussion:

 Before the trial, Guerra's attorneys filed motions requesting production of all material inconsistent with the guilt or lawful arrest of Guerra. They also filed an extensive motions for pretrial discovery and inspection. Obviously, the conduct of the police and prosecutors was unknown to the defense attorneys. Yet, it was the type of conduct that the motions sought and the type that the prosecutors were duty bound to disclose.

In the discussion that follows, the Court analyzes the various witness statements and the police's and prosecutors' conduct surrounding the statements. It is the conduct giving rise to and surrounding the statement that is the focus of the petitioner's charge.

According to Garcia, she told the police on the night of the shooting that the short-haired man was the shooter. The first written statement prepared for her described the events and actor as follows:

> The blond hair (sic) reach into the front of his pants and pull out a pistol and shoot the policeman ... the man with the blonde hair then shot the man in the read (sic) car ... the man that shot the policeman and the man in the red car had blonde hair and was about 5′8″ tall.... He was wearing brown pants and a brown shirt....

She was asked to sign this written statement, which omitted her exonerating reference to the fact that the short-haired man was the shooter and that the long-haired man was the man with the empty hands near the front end of the police car at the time Officer Harris was shot. Garcia, who had attended only seven years of school, asked the police officer to read it to her because she could not read well. The police officer refused and told her to "just sign it." According to Garcia, she then signed it because of the earlier verbal threat that another police officer made concerning revoking her husband's parole for living with her, Garcia, a minor.

After Garcia watched the lineup, she told the police that the man in the number 4 position was not the shooter but, instead, was the man with empty hands near the front of the police car at the time officer Harris was shot. When the second statement was prepared, it omitted the exonerating information provided by Garcia. This second statement was not read to Garcia. She was asked to sign this second statement. She did so, for the same reason that she had signed the first statement.

At the re-enactment, Garcia told one of the two prosecutors that the short-haired man was the one who appeared to have been the

shooter, not the long-haired man. This exculpatory evidence was not recorded and not passed on to the defense.

At the pretrial weekend meeting, Garcia told one of the two prosecutors again that the long-haired man wearing the green shirt was not the man who had shot the police officer. This exculpatory evidence was not recorded and not passed on to the defense.

From the Court's perspective, knowledge of this conduct explains the prosecutor's impatience with Garcia during the trial of the case. The prosecutor insisted that Garcia had not seen a blond-haired man shoot officer Harris causing her to testify that she had not. The prosecutor then attributed Garcia's reluctance to testify to fear of reprisal from people in the neighborhood.

According to Diaz, she told the police that when officer Harris was shot, the long-haired man was standing on the driver side of the police car near the front end, facing toward the police car with his arms extended out over the police car, feet spread apart, and that the palms of his hands were facing down toward the police car. In addition, his hands were empty and were positioned as if he were about to place his hands on the hood of the car to be searched. In spite of this, an officer prepared a statement omitting the exonerating information provided by her and inserting the incorrect information that the long-haired man pointed a gun in the direction of the police car and shot four times at the police car. Tired, she signed the statement without reading it, unaware of its true contents.

After the lineup was conducted, Diaz told the police that the man in the number 4 position was the man who had been on the driver side, near the front, of the police vehicle. In spite of hearing this, an officer prepared another statement omitting the exonerating information provided by her. She signed this statement, as well, without reading it, unaware of its true contents.

At the pretrial weekend meeting, Diaz told one of the two prosecutors that she was at the crime scene at the time of the shooting and that it did not look as though Guerra had a gun, because at the time of the shooting Guerra's hands were open with his palms down on the hood of the police car. This exculpatory evidence was not recorded and not passed on to the defense.

During the habeas hearing, Perez testified that he told the police on the night of the shooting that he saw two men running past him that evening after the shooting of officer Harris. The first man ran east on the south side of Walker and turn south onto Lenox. Perez stated that he was too far away to recognize the runner. A second man ran east on the north side of Walker and turned south on Lenox. As the second man ran past Perez, the man, who looked like Carrasco, pointed an object at Perez that he was holding in his left hand. As he ran, the object fell from his hand to the street. It made a metallic sound as it hit the pavement and looked like a handgun with a clip. The runner stopped to pick the object up, and continued running south on Lenox toward McKinney.

When Perez's statement was prepared, it omitted the fact that Perez had identified the object as a handgun. The police officer persuaded Perez to have the description in the statement read that the runner had dropped a metallic object. Later, in discussing his testimony with the prosecutor he was informed that he should describe the "object" as an "object" if he was not "100% certain" that it was a gun.

At the lineup, Perez told the police that he recognized Guerra from having seen him earlier in the hallway, but that Guerra was not the man who had dropped the object as he ran past him earlier that night. He was not invited to the reenactment a week or so after the shooting.

Jose Heredia's testimony in this proceeding and his written statement identifies the passenger as the shooter. He testified that he told the police that when officer Harris was shot, officer Harris was standing just behind his driver's door and that the long-haired man was standing on the driver's side of the police car near the front end. He further stated that the man was facing the police car with his hands on the hood of the police car, a foot apart, palms down and empty. The short-haired man, approaching

a few feet southeast of officer Harris and the long haired man (Guerra), pointed a gun at officer Harris and shot him.

After hearing Heredia's version, a police officer prepared a statement that omitted the exonerating information given concerning Guerra; specifically, that Guerra was against the car and empty handed when Carrasco came up behind Guerra and shot officer Harris. Heredia, like several of the other witnesses, tried to read his statement but could not because he could not read English. Like others, he was told to "just sign it." He further testified that he was afraid not to sign the statement, having seen his mother (Holguin) arrested and handcuffed at the scene.

After Heredia viewed the lineup, he told a police officer that he recognized Guerra as the driver of the black car and that Guerra was not the man that shot officer Harris. Heredia was not asked to sign another statement.

Holguin, Heredia's mother, testified that she told the police that she had not seen the shooting at all. In spite of this, a statement was prepared that she was told to sign. Holguin testified that she informed the police officer who prepared the statement that she could not speak English. No one translated the statement for her benefit. Although completely unaware of the contents of the statement, Holguin testified that she signed it because she was ordered to do so. Earlier that evening, she had been handcuffed at the scene for several hours before being brought to the police station.

George Brown testified in this proceeding that he told the police that, after hearing shots that were later determined to have killed officer Harris, he ran west on Walker street from Delmar past Lenox to Edgewood. As he passed Lenox he saw someone running south on Lenox that appeared to be Carrasco. Later, he saw Perez who stated to him that the man who was seen running south on Lenox was carrying a gun and had dropped it. Brown related Perez's statement to the police, that the person handling the weapon had dropped it while running. Brown's written statement omitted the information that he had received from Perez and had related to the police.

### V(c) Conclusion:

The Court finds that the testimony of Garcia, Diaz, Holguin, Heredia and Perez is credible. Moreover, it is consistent with the physical evidence that establishes that Guerra did not shoot officer Harris and Mr. Armijo. Specifically, the physical evidence shows that the shooter used a nine-millimeter handgun to kill both officer Harris and Mr. Armijo. It further shows that the weapon had marks on it of the nature and type that would exist had the weapon been dropped to the pavement.[8] Important to these findings is the physical description of the shooter given by the scene witnesses in their initial interviews describing Carrasco and the omission of material exonerating information from the written statements prepared by the police based on the interview descriptions.

As well, the fact that the weapon was found on the body of Carrasco was ample evidence of an exonerating nature to put the police and the prosecutors on notice that Carrasco was the killer. The prosecutors' theory, that Guerra and Carrasco had mistakenly switched weapons in the car before the shooting and had exchanged them later at the house (4907 Rusk), was sheer speculation and no evidence was ever proffered to support this theory. Moreover, it was not even a reasonable hypothesis based on any inference that could have been drawn from the evidence.

The police officers and prosecutors had a duty to accurately record the statements of

---

**8.** Floyd E. McDonald, formerly head of the forensic lab for Houston Police Department, the department where Amy P. Heeter worked, testified that the description by Perez of what occurred on that evening concerning the dropping of the weapon, is consistent with the marks that he found on the weapon. Moreover, the positioning of the parties leads to the conclusion that the person whose hands had been placed on the hood of the vehicle was not the shooter. The shooter, because of the location of the bullets found after the shooting, would have stood east of the police officer and the other person. The bullets lodged in the house on the northwest corner of Walker and Edgewood. Officer Harris' vehicle was parallel to this house.

the witnesses, to fairly investigate the case, and to disclose all exculpatory evidence. Moreover, they had a duty to not prosecute an innocent man. They failed in these duties. These intentional omissions, during the investigation and prosecution, and the inclusion of poisonous speculations during trial, had the effect of suppressing and destroying favorable testimony that the Court finds was material to Guerra's defense. The information that the police and prosecutors failed to disclose, as well as the manner that the investigation and prosecution were conducted, hardly left a paper trail, and intentionally so. The concept of deceit was planted by the police and nurtured by the prosecutors. This conduct by the police and prosecutors could only have been deliberate and, so much so, that even the exonerating evidence was used in such a manner as to create a materially misleading impression.

The prosecutors and officer Amy Parker Heeter, the state's expert on trace metal test, also misled the defense attorneys concerning the trace metal detection test results. Specifically, Guerra's attorneys were not shown or told what the true results of the trace metal detection test were. The prosecutors told the defense attorney only that the test had been positive as to Carrasco's handling of officer Harris' weapon and negative for the murder weapon. According to the defense attorneys, this statement led them to conclude that only one trace metal pattern was found on Carrasco's hands, that of officer Harris' weapon.[9] This was a half-truth.

In fact, the trace metal pattern matching officer Harris' weapon was on Carrasco's right hand. There were also trace metal patterns found on Carrasco's left hand. This revelation could have been utilized by the defense to impeach the expert's testimony and/or impeach the state's theory of the case, that Guerra was the shooter and had, during the course of escaping, returned Carrasco's weapon. More importantly, armed with this knowledge, Guerra's attorneys may have hired their own trace metal expert who could have testified that the trace metal patterns

on Carrasco's left hand were consistent with the patterns left by the nine-millimeter weapon found under his body after he was shot and killed by the police.

The state failed to disclose that there were any trace metal patterns on Carrasco's left hand, even though they knew that they, arguably, matched the nine-millimeter weapon. Although the police were told, repeatedly, that the shooter fired the weapon with his left hand, there is no meaningful record of any efforts to identify the trace metal patterns on Carrasco's left hand. The police and prosecutors had a duty to eliminate Guerra as the shooter, if the evidence supported it.

Floyd McDonald, a ballistics expert, testified at the evidentiary hearing that when held and fired, the murder weapon left a discernible trace metal pattern in less than 60 seconds. He testified that neither sweat nor normal washing with soap and water would remove the pattern. Rubbing one's hands with sand or dirt, with less than sustained vigor, would not remove such a pattern. Police records reflect that the police believed that the dirt found on Guerra's hands, when he was arrested, came from his having been on the ground being searched by the police after his arrest. Although the ground was damp from a light rain, contact with the ground would not have erased any trace metal on his hands.

McDonald also testified that the two trace metal patterns found on Carrasco's left hand after his death are consistent with both the type of trace metal pattern left by firing the nine-millimeter weapon and Perez's testimony that Carrasco dropped and retrieved a gun as he ran past him. This dropping and retrieving of the weapon accounts for the double trace metal image found on Carrasco's left hand. It is undisputed that Guerra had no trace metal of any sort on either hand or on his body. So the testimony of Heeter, that the metal comprising officer Harris' weapon does not easily leave trace metal patterns, was a "red-herring." It was of no

9. It should be noted that during the testing of the nine-millimeter pistol Heeter held it in her left hand, as was observed and reported about Carrasco by the witnesses. Yet, she failed to disclose that trace metal was found on Carrasco's left hand.

evidentiary value to the trial and was designed merely to confuse the jury.

The state's theory, that both defendants laid their weapons on the front seat in the vehicle and somehow did not realize that they had exchanged weapons until they met later at which time they switched weapons, in the face of this physical evidence, is beyond belief, particularly when the theory does not rise above the level of speculation.

This evidence, even if it were concealed from the prosecution by the police, is imputed to the state prosecutors because the evidence was material and critical to the case and because an inquiry would have revealed it to them. *Williams v. Griswald,* 743 F.2d 1533, 1542 (11th Cir.1984); *United States v. Antone,* 603 F.2d 566, 569 (5th Cir.1979). By dealing in half-truths and innuendo and by suppressing evidence that was favorable and material to Guerra's defense, the prosecutors violated Guerra's right to a fair trial. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97.

The Court concludes that, but for the conduct of the police officers and the prosecutors, either Guerra would not have been charged with this offense or the trial would have resulted in an acquittal. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383–84.

### VI.

### Prosecution's Use of Known False Evidence And Known Illegitimate Arguments at Trial

Next, the petitioner asserts that the prosecutor used known false testimony and illegitimate arguments in the trial and closing arguments. In this regard, the petitioner asserts that: (a) the prosecutors solicited and encouraged Garcia and Perez to overstate or understate the facts; (b) the prosecutors injected false statements concerning the character of Heredia, the 14 year old, when they accused him of being either drunk or having "smoked something" because he yawned during his testimony; and (c) the prosecutors questioned Heredia about an alleged murder at the cemetery, near the shooting scene

knowing that it was a yarn spun by the children.

■ The Court has previously stated the facts surrounding the testimony of Garcia and Perez and will not restate the fact here. Suffice it to say that the knowing use of false testimony by the prosecutors violates a defendant's "due process" rights under the Fifth and Fourteenth Amendments. *See Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). The Court finds that such violations are abundant in the record.

■ The prosecutors also committed misconduct by deliberately and knowingly putting into the mouths of witnesses words that the witnesses had not said and did not believe to be true. This was accomplished by persistently cross-examining those witnesses on a false basis and by making improper insinuations and assertions calculated to mislead the jury and discredit unfavorable testimony. During the course of the testimony, the prosecutor inserted in his questions inaccurate statements from Diaz's testimony that were prejudicial to Guerra. The question and answer is as follows:

> Q. You say you saw this one man and your saw him "pointing." Was he pointing toward or in the direction of the police car or the police officer?
>
> A. Uh-huh, the direction of the police car.

On no less than five (5) other occasions, the prosecutor included within the question, an incorrect statement of the witness' prior testimony. He repeatedly used the phrase "pointing at the police officer."[10] The use of this untrue information was material and detrimental to Guerra's defense. *United States v. Williams,* 504 U.S. 36, 59–61, 112 S.Ct. 1735, 1749, 118 L.Ed.2d 352 (1992) (quoting *Berger v. United States,* 295 U.S. 78, 84–85, 55 S.Ct. 629, 631–632, 79 L.Ed. 1314 (1935)).

■ Regarding the questions to Heredia about alcohol and drugs, the prosecutor asked him if he was drunk or had smoked anything. These questions were designed to strike down the young boy because he would dare testify contrary to the prosecutor's case

---

**10.** *See also* note 2 at pp. 7–8, *supra.*

theory. In closing argument, the prosecutor argued to the jury that Heredia was under the influence of either alcohol or narcotics. This improper conduct is rank ridicule and intimidation utilized to its consummate when any witnesses did not testify to this state's liking.

The petitioner also complains about the trial testimony of officer Jerry Robinette. After J. Luna testified that Carrasco had arrived at their home brandishing both the nine-millimeter weapon and officer Harris' weapon, the state called officer Robinette. Officer Robinette testified that J. Luna and Esparza had told him that they were not home in and around the time that the shootings had occurred because they had left earlier and did not return until around 11:30 p.m., when they were questioned. Even if this is true, the testimony is of no value because they were there when Carrasco arrived later.

Officer Robinette's testimony is inconsistent with J. Luna's trial testimony and also with police reports showing that both J. Luna and Esparza were home when Carrasco and Guerra left as well as when they returned later that night. The police reports [11] show that officer Antonio Palos questioned J. Luna at 4907 Rusk just before Carrasco was killed. In spite of this knowledge, the prosecutor argued that J. Luna and Esparza had lied when they testified that they were at 4907 Rusk when Carrasco returned.

Both prosecutors claimed as fact, in closing argument, that five eyewitnesses, **who had not conferred with each other,** told the police that Guerra killed officer Harris and Mr. Armijo and had identified Guerra at the lineup. Both prosecutors knew that this was factually incorrect because at least one of the prosecutors was at the scene shortly after the shooting and participated in the gathering and interviewing of witnesses. Moreover, both had participated in the reenactment and the pretrial weekend meeting where the various statements of the witnesses were discussed and conformed.

The petitioner also urges, and legitimately so, that there was no justification for informing four jurors, during voir dire, that he was an "illegal alien" and that this fact was something that the jurors could consider when answering the punishment special issues. According to the prosecutors, this fact could help in a determination of whether Guerra should received a life sentence or the death penalty.

The "offense" of unlawful entry into the United States is irrelevant to the issue of a defendant's propensity for future violent and dangerous criminal behavior. No proof was offered that illegal aliens are more prone than citizens to commit violent crimes. Guerra was entitled to have his punishment assessed by the jury based on consideration of the mitigating and aggravating circumstances concerning his personal actions and intentions, not those of a group of people with whom he shared a characteristic. *Zant v. Stephens,* 462 U.S. 862, 878–79, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983).

The prosecutors also appealed to the jury to "let the other residents at 4907 Rusk ... know just exactly what we citizens of Harris County think about this kind of conduct...." This appeal went beyond arguments seeking law enforcement to improperly play to the jury's prejudice by painting all the residents at 4907 Rusk with the broad brush of shared responsibility for the death of officer Harris. Thus, they were in need of being taught a lesson. This "us" against "them" argument is also nothing more than an appeal to ethnic or national origin prejudice which is constitutionally impermissible. *McCleskey v. Kemp,* 481 U.S. 279, 309 n. 30, 107 S.Ct. 1756, 1776–77 n. 30, 95 L.Ed.2d 262 (1987); *see also McFarland v. Smith,* 611 F.2d 414, 416–17 (2d Cir.1979); *United States v. Doe,* 903 F.2d 16, 24–25 (D.C.Cir. 1990); *see United States ex rel. Haynes v. McKendrick,* 481 F.2d 152, 157 (2d Cir.1973).

The petitioner's claim of denial of "due process" did not end with the police and the prosecutor, it continued into the Court process. It is asserted that the inaccurate

---

11. These reports were not produced or made available to the defendant, pretrial, pursuant to the defendant's discovery request.

translations of the witnesses' testimony from Spanish to English by the court interpreters prevented a fair trial. The first interpreter, Linda Hernandez, was removed after one of the jurors complained that she was interpreting inaccurately. The second court interpreter, Rolf Lentz, acted inappropriately by making jokes and adopting an improper casual manner, while communicating with several defense witnesses in Spanish. Much of this went unchecked by the court.

■ The petitioner also questions the propriety of an experienced prosecutor questioning a witness about the witness' participation in a crime that the witness was not under investigation for and had not been criminally charged. One of Guerra's roommates, who testified in Guerra's defense, was questioned about his "participation" in a robbery that the prosecutors well knew had not resulted in a charge. Yet, it was done, in all likelihood, to affect the judgment of the jury in determining the witnesses' credibility. This knowing false accusation by the prosecutors violated Guerra's "due process" rights because the question was not a proper question, even on character.

This type of deliberate violation of oath as a prosecutor and violation of the rules of evidence is incompatible with the rudimentary demands of justice and fair play. This principle remains true even when the state, though not soliciting false evidence, allows it to go uncorrected. *Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104 (1972).

## VII.

### Cumulative Effect of Prosecutorial Error

■ Finally, the petitioner contends that the cumulative effect of the errors made by the trial court and the prosecutors resulted in an unfair trial. Because the state court, in considering the petitioner's petition for writ of habeas corpus, found no waiver of error, there is no bar to considering the errors found in a cumulative error analysis. *Derden v. McNeel,* 978 F.2d 1453, 1458 (5th Cir.1992) (*en banc*), *cert denied,* —— U.S. ——, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993). When the errors of the state infuse a trial with such prejudice and unfairness as to deny a defendant a fair trial, due process has not been enjoyed. *Id.*

■ Here, the extent of the prosecutorial misconduct is legion. The number of instances of misconduct as well as the type and degree compel the conclusion that the cumulative effect of the prosecutors' misconduct rendered the trial fundamentally unfair. There is no doubt in this Court's mind that the verdict would have been different had the trial been properly conducted. *Kirkpatrick v. Blackburn,* 777 F.2d 272, 278–79 (5th Cir. 1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986).

## CONCLUSION

The police officers' and the prosecutors' actions described in these findings were intentional, were done in bad faith, and are outrageous. These men and women, sworn to uphold the law, abandoned their charge and became merchants of chaos. It is these type flag-festooned police and law-and-order prosecutors who bring cases of this nature, giving the public the unwarranted notion that the justice system has failed when a conviction is not obtained or a conviction is reversed. Their misconduct was designed and calculated to obtain a conviction and another "notch in their guns" despite the overwhelming evidence that Carrasco was the killer and the lack of evidence pointing to Guerra.

The police officers and prosecutors were successful in intimidating and manipulating a number of unsophisticated witnesses, many mere children, into testifying contrary to what the witnesses and prosecutors knew to be the true fact, solely to vindicate the death of officer Harris and for personal aggrandizement. The cumulative effect of the police officers' and prosecutors' misconduct violated Guerra's federal constitutional right to a fair and impartial process and trial.

Therefore, the petitioner's Writ of Habeas Corpus is GRANTED, the conviction and judgment are set aside.

It is ORDERED that the Writ of Habeas Corpus is conditionally granted unless the state begins retrial proceedings by arraigning the petitioner within thirty days from the

date this order becomes final. If the state does not complete the arraignment within the allotted time, the petitioner shall be released from custody.